**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

**CASE NO._____**

MICHAEL NEWMAN, as Personal Representative
of the ESTATE OF JOEL NEWMAN, and
EDITH NEWMAN,

     *Plaintiffs*,

v.

AMERICAN HOME ASSURANCE
COMPANY, INC.,

     *Defendant*.

_____/

## COMPLAINT FOR DAMAGES

   Michael Newman, as Personal Representative of the Estate of Joel Newman, and Edith Newman sue American Home Assurance Company, Inc. and allege:

### NATURE OF THE ACTION

    1.    This is an action seeking reasonably foreseeable damages caused by American Home's manifold violations of Florida's civil remedies statutes set forth in Fla. Stat. § 624.155, including the incorporated provisions of Florida's Unfair Insurance Trade Practices Act.

    2.    As described below, throughout its handling and adjustment of the Newmans' Hurricane Irma property insurance claim, American Home had multiple opportunities to pay the full amounts owed to its insureds, which it could and should have done had it acted fairly and honestly toward the Newmans with due regard for their interests.

    3.    The Newmans' home was badly damaged by Hurricane Irma, and American Home at every opportunity tried to reduce, delay, and deny all or part of their recovery, including, among

other things, by failing to conduct full and fair investigations at its own expense, and by generating incomplete, lowball estimates designed to pay less than what was contractually owed. American Home's violations of Section 624.155 are believed to have been committed knowingly, willfully, wantonly, and/or maliciously. At minimum, American Home committed the violations with reckless disregard for the rights of its insureds.

4.     American Home's years-long delay in paying what was contractually owed to the Newmans cost them more, both personally and financially, than the insurance policy provides. The extra-contractual damages foreseeably suffered by the Newmans are described in detail below. Those damages continue to accrue daily.

### PARTIES, JURISDICTION & VENUE

5.     The Newmans are the insureds under the policy issued by American Home bearing policy number PCG 0002409017 (the "Policy"), underwritten by the AIG Private Client Group and marketed and sold to high net-worth individuals like the Newmans. The Policy insured their home and property located at 355 Ocean Boulevard, Golden Beach, FL 33160 (the "Property").

6.     Joel Newman was domiciled in Florida at the time of his death, and Edith Newman is sui juris, also domiciled in Florida and a resident of Miami-Dade County, Florida. Joel Newman at all material times suffered from numerous physical maladies, which rendered him particularly susceptible to mold. Both he and his wife were of an age that entitled them to enhanced duties of good faith, including those imposed by the Florida Adjuster's Code of Ethics.

7.     Joel Newman's maladies ultimately led to his passing at the age of 72. Unfortunately, and rather than being able to enjoy the last years of his life at the Property which he cherished, he and his wife endured AIG's claim adjusting mis-behavior, resulting in the final

resolution of the hurricane damage claim only a few months before his death, years after the claim should have been fairly resolved.

8.      American Home is a New York corporation with its principal place of business in New York, New York. American Home is a member of the American International Group, Inc. ("AIG"). American Home is in the business of issuing policies of insurance in the State of Florida.

9.      This Court has jurisdiction over this action pursuant to 29 U.S.C. § 1332(a), as this action is between citizens of different states and the amount in controversy exceeds $75,000.00, not including interest, fees and costs as may be allowed by law.

10.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) as a substantial part of the events giving rise to this dispute occurred in this district, the Property in question is located in Golden Beach, Florida within this district, and, pursuant to 28 U.S.C. §§ 1391(c)(2) and 1391(d), American Home is deemed to reside in this district because American Home is subject to personal jurisdiction in this district.

11.     This Court has personal jurisdiction under Florida's long-arm statute, Fla. Stat. § 48.193(1)(a), because American Home operates, conducts, and engages in a business in this state; contracted to insure property and risks located in this state; and breached its contractual and extra-contractual obligations in this state through its lack of good faith and unfair claims practices described below.

12.     The exercise of personal jurisdiction would also comport with due process because American Home has sufficient minimum contacts with this state and purposefully availed itself of the privilege of conducting its business in this state by exploiting the Florida insurance market and entering into contractual relationships in Florida, including the relationship at issue here.

**FACTUAL ALLEGATIONS**

**AIG's Private Client Group Policy**

13.     In September 2016, American Home sold the Newmans a Private Client Group homeowner's insurance policy insuring their Property, with effective dates of September 22, 2016 through September 22, 2017. A copy of the Policy is attached as **Exhibit A**.

14.     American Home issued and sold the Policy to the Newmans through AIG's Private Client Group.

15.     The AIG Private Client Group, in turn, markets its "innovative" insurance products as enhanced protection, targets affluent people as its preferred customer base, and touts its products as minimizing threats to the personal wealth of high net-worth individuals.

16.     The Policy sold to the Newmans is a manuscript policy designed and written by AIG to deliver the promised protection of personal wealth. It has many features and benefits unavailable under traditional homeowner's insurance policies.

17.     The Newman's claim was adjusted and otherwise handled through AIG's Private Client Group, and was subject to the same claims handling guidelines and practices applicable to all claims handled by AIG's Private Client Group.

18.     AIG marketed this product as a "custom approach to protecting unique homes," touting its personal, timely, "white glove" and vigorous claim service.

19.     In reality, upon information and belief, the AIG Private Client Group encourages adjusters to underpay claims through a variety of incentives which will be the subject of discovery in this action.

20.     The Policy provides coverage against "all risks of direct physical loss or damage to [the Newmans'] house, contents, and other permanent structures unless an exclusion applies."

21.     The Policy also provides coverage for "additional living expenses, which consist of extra living expenses, loss of fair rental value, and forced evacuation expenses" and "Ordinance or Law" coverage, which covers costs in addition to the cost to rebuild the Property resulting from the need to conform to modern building codes, laws, or ordinances.

22.     Under the ordinance or law coverage (unlike standard Insurance Services Office (ISO) forms) the insurer must pay "extra expenses" to "obey" any law or ordinance regulating the repair or rebuilding of property damaged by a covered loss. The limit for this coverage is 30% of the coverage on the declarations page for the home, or $4,439,935.00, increased by cost of living as provided by the Policy.

**<u>Hurricane Irma Damages the Newmans' Property</u>**

23.     The insured Property is a two-story (three-floor) ocean-front home built in 1995 with complex construction details and the finest finishes. The Property is roughly 28,000 air-conditioned square feet and sits directly on the ocean. A photograph of the home in its pre-loss condition is pasted below:



24.     Nearly every element of the home is custom, from walls in the dining room made of stone quarried in Italy to the built-in and redundant storm shutter systems.

25.     The Property is composed of structural load-bearing masonry walls, a wooden roof truss framing system, and approximately 126 window/door openings.

26.     On September 10, 2017, Hurricane Irma struck the southern coast of Florida and battered the Property continuously for approximately 36-48 hours. The hurricane caused severe, covered damage to the Property, which suffered significant wind damage and water intrusion as a result of the storm, particularly through the roofs, windows, and doors. The water intrusion led to the development of mold, and the Newmans had to find alternative living arrangements, in part due to Mr. Newman's physical issues described above.

27.     American Home has never questioned the Newmans' need to vacate the home following the hurricane given its resulting inability to be inhabited safely.

28.     For their part, the Newmans sought to mitigate any additional damage immediately after the storm—for example, installing tarps, completing temporary tile repairs on the roof, and waterproofing sealants applied on and around multiple structural components within the basement masonry and structural cracks. Likewise, exterior stucco patching, window and door sealants, and adjustments were made when and where necessary. These efforts, albeit extensive and costly, could not alone mend the damage to the Property, which needed significant repairs.

29.     Nor were those efforts able to thwart the spread of mold, which only a prompt and complete repair of the weather envelope would accomplish, together with costly mold abatement.

### American Home's Claims Handling[1]

30.     On October 12, 2017, the Newmans timely notified American Home of their claim arising from Hurricane Irma.

31.     American Home assigned the investigation of the Newmans' losses to employees of an AIG entity called AIG Claims, Inc., which in turn investigated and adjusted the loss through members of the AIG Private Client Group. For simplicity, the Newmans will refer to American Home as the entity owing the non-delegable obligations imposed by law as detailed below.

32.     The Newmans fully cooperated with American Home's investigation and made the Property readily available for inspection.

---

[1] The Newmans expect to uncover additional specifics about American Home's claims handling practices in discovery, including additional facts that would support a claim for punitive damages. The Newmans reserve the right to amend their complaint as this information is obtained through the course of discovery in this action and to seek punitive damages at trial.

33.     From the outset, however, American Home dragged its feet in handling the claim, taking months to assemble a team to inspect the Property and even longer to provide the Newmans with an estimate of the damage over any applicable deductible.

34.     American Home's delays caused or contributed to the continued deterioration of the Property, despite the Newmans' extensive mitigation efforts.

35.     Shortly after the claim was initially reported, American Home estimated that there was only minimal covered damage; less than the $295,996.00 hurricane deductible.

36.     Thereafter, on or about December 5, 2017, American Home's claim investigator, D.J. Estep of HAAG Engineering, submitted an estimate of the Newmans' damages totaling $498,571.91.

37.     American Home's claim investigator was unqualified. In fact, Mr. Estep had been employed by HAAG for only two months prior to investigating the claim.

38.     American Home's failure to properly and reasonably hire and supervise its adjusters and investigators contributed to its ensuing failure to conduct a full and thorough investigation of the Newmans' claim.

39.     As an example, despite the obvious need for the complete replacement of the tile roof for which the Newmans received a quote of $746,350, HAAG claimed that the Newmans' roof could be repaired for just under $30,000.

40.     And despite the fact that the Property suffered wind and water damage to many of its custom windows and doors, for which the Newmans received a quote of $1,158,622.20, HAAG asserted that the windows and doors could be repaired for just under $9,000.

41.     Remarkably, the most significant cost listed on the HAAG estimate was painting.

42.     American Home's lowball estimate was many millions of dollars less than the now-confirmed amount necessary to repair the Property to its pre-loss condition.

43.     Indeed, as discussed below, an appraisal award was later issued in the Newmans' favor in an amount approximately ***20 times larger*** than American Home's estimate.

44.     As a result of American Home's failure to hire a competent investigator and provide a fair, good faith estimate, the Newmans were forced to engage the services of multiple vendors at a considerable cost to gather the bids, proposals, invoices, analyses, and other documentation to support their claim and obtain the recovery needed to restore the Property to its pre-loss condition.

45.     In addition, the Newmans hired a Public Adjuster, Stellar Public Adjusting ("Stellar"), to coordinate the investigation and source bids and inspections of the Property. The hiring of the adjuster would have been unnecessary had American Home undertaken an appropriate good faith investigation of the damage to the home.

46.     To fund this investigation and offset costs, Stellar, requested an advance payment of $500,000 from American Home.

47.     American Home did not provide that payment, but could and should have done so had it acted with due regard for the Newmans' interests.

48.     The Newmans were thus left to fund and conduct the investigation into scope and the bidding process for the repair of the Property on their own. Functionally, American Home improperly shifted the cost of conducting a full, fair, unbiased and prompt investigation of the claim to its insureds.

49.     Stellar compiled all the relevant bids and invoices and estimated the total property damage at the time compiled to be $7,369,419.14. Alternative living expenses were also estimated at $80,000 (for two months' rent), bringing the total claimed damages to $7,449,419.14. Notably,

the Newmans advised American Home that their alternative living expenses would rise to $520,000 (inclusive of security deposit) by the end of their twelve-month lease of an alternative dwelling to live in.

50.     In addition, Stellar hired Allied Build Inspection Services ("Allied") to evaluate the loss, which issued a report on December 30, 2017, concluding, among other things, that the Property had sustained extensive damage due to wind, wind pressure, and wind-borne debris; that repair of the roof was not feasible due to wind damage, age, and the 25% rule, thus requiring a complete replacement; and that the wind-related damage caused extensive water intrusion into the interior, which caused water damage to the roof decking, walls, ceilings, insulation, and finishes.

51.     A proof of loss as to the portion of loss that American Home at that point agreed was covered was provided on or about March 6, 2018, and additional documents confirming the full extent of the loss—then-estimated to be over $7 million—were also provided to the insurer.

52.     American Home continued to delay at the expense of its insureds. For example, it took nearly six months (March 20, 2018) after the Newmans made the claim for American Home to issue any payment to the Newmans. That payment ($202,575.91) was a mere fraction of the now-confirmed and readily apparent damage to the Property.

53.     Seven months later, on October 2, 2018, the AIG Private Client Group on behalf of American Home sent the Newmans a letter indicating that the claim had been reassigned to a new adjuster, Gweynn D. Kawakam.

54.     Ms. Kawakam then retained Daniels Brothers, Inc. ("Daniels") to re-inspect the Property and provide a new damage estimate.

55.     Daniels, however, dragged its feet and did not assemble a complete team to visit the Property until January 30, 2019.

**The First Civil Remedy Notice**

56.     Accordingly, on or about February 20, 2019, the Newmans filed a Civil Remedy Notice of Insurer Violations ("First CRN") detailing the claims handling delays and completely unrealistic estimates involving Mr. Estep.

57.     The First CRN complied with Fla. Stat. § 624.155(3) and was accepted for filing by Florida's Office of Insurer Regulation ("OIR").

58.     A copy of the First CRN, including American Home's response, is attached as **Exhibit B**.

59.     In order to cure the violations outlined in the First CRN, the insurer was required to immediately tender all insurance proceeds due for the loss, pay statutory interest on the amount of unpaid contractual damages from the date the claim was reported, and comply with their duties to fairly adjust the claim going forward.

60.     The 60-day safe harbor period for the First CRN expired on or about April 21, 2019.

61.     Rather than curing the violations identified in the First CRN, American Home again provided a lowball damage estimate, this time prepared by their new consultant, Daniels.

62.     American Home's new position was that Newmans' total damage—including real and personal property damage and alternative living expenses (ALE)—was $981,274.90.

63.     While suddenly more than three times its prior estimate, the revised estimate was still many millions of dollars less than the amount needed to restore the Property to its pre-loss condition – not including personal property and ALE.

64.     Indeed, the appraisal awards were still approximately *12 times greater* than the new estimate.

65.     The Daniels estimate further evidenced American Home's failure to conduct a full and fair investigation and American Home's misrepresentations of the facts surrounding the claim and the loss.

66.     For instance, it concluded that the windows were not damaged by Hurricane Irma, that the doors suffered a mere $2,880 in damage, and that the water "damage on the interior [was] minimal," citing a faulty HEI Sytems ("HEI") report based on an inspection that took place a year and a half after the hurricane.

67.     The Daniels estimate inexplicably valued the Property's roof damage at a mere $8,350 based on the false notion that the roof was past its functional life and that Irma related damage accounted for damage to less than 25% of the roof.

68.     The actual facts showed that custom tile roofs, as opposed to cheaper roofs for tract homes, typically have life spans of 30-40 years rather than 18 years, and the documentary evidence provided to American Home showed that more than 25%—indeed, more than 50%—of the roof had been damaged due to the hurricane.

69.     On April 4, 2019, American Home made a supplemental payment of $482,702.99, bringing the total payment to $685,278.90, which undervalued the damage estimates provided by Stellar by roughly $6.7 million according to third-party experts engaged by the Newmans and the amount of incurred alternative living expenses.

70.     But American Home continued to delay paying or in good faith attempting to pay the full amounts owed under the Policy, and rejected reasonable offers by the Newmans to resolve the claim.

71.     For example, in light of their age and desire to fund needed repairs, the Newmans offered to resolve the entire claim for less than the balance of the Stellar estimate after deducting partial payments made by American Home. American Home refused this good faith offer.

### The Second Civil Remedy Notice

72.     On May 6, 2019, the Newmans filed a second CRN as American Home continued to grossly underestimate, underpay, and delay the handling of their claim (the "Second CRN").

73.     The Second CRN complied with Fla. Stat. § 624.155(3) and was accepted for filing by Florida's OIR.

74.     A copy of the Second CRN, which includes American Home's response, is attached as **Exhibit C**.

75.     In order to cure the violations identified in the Second CRN, American Home was required to pay $6,468,144.24 together with interest.

76.     The 60-day cure period for the Second CRN expired on or about July 5, 2019.

77.     As with the First CRN, American Home failed to cure the violations detailed in the Second CRN before expiration of the 60-day safe harbor period.

78.     On the same day the Second CRN was submitted and shortly after the Newmans' settlement offer described above, American Home demanded appraisal of the loss to include amounts needed to repair the property damage, personal property losses and ALE. This was *604 days* after the hurricane began damaging the home.

79.      In September 2019, the Newmans requested that American Home at least reimburse them for living expenses incurred after they were forced to move out of their home. But American Home refused to do so.

80.     In addition, the Newmans through counsel advised that an appraisal award for property alone would likely dwarf the Newmans' prior settlement offer – a suggestion that proved prescient – but American Home did not relent.

### The Appraisal Awards Dwarf American Home's Estimates

81.     On March 4, 2020, roughly two and a half years after Hurricane Irma made landfall, the appraisal panel issued a partial award in the amount of $9,626,678.67 for the property damage portion of the claim (exclusive of contents, ALE, matching, and ordinance or law coverage).

82.     Thereafter, American Home rejected another reasonable offer calculated to resolve the balance of the claim.

83.     On or about April 18, 2020, well after the 60-day cure periods expired for both the First and Second CRNs, American Home paid the Newmans $8,645,403.77 by check (with a cover page acknowledging that it was a partial payment).

84.     On September 15, 2020, the appraisal panel issued a second award in the Newmans' favor covering a portion of their ALE losses and assessed personal property losses, which totaled $1,916,482.33.

85.     On or about October 20, 2020, American Home paid $1,538,393.15 for the second award and returned the Newmans' hurricane deductible.

86.     These two awards collectively amounted to $11,543,161.00—***12 times more*** than American Home's highest estimate.

### The Ordinance or Law Claim

87.     After receiving payment of the appraised amounts, on June 17, 2020, the Newmans notified American Home that they had encountered numerous issues likely triggering ordinance or law coverage, including those related to windows, doors, and roof trusses.

88.     The Newmans informed American Home that they were supplementing their claim and seeking ordinance or law coverage (often referred to as "L&O" losses).

89.     Some of these issues had already been identified in a September 24, 2019 report prepared by GFA Engineering and a December 30, 2017 report issued by Allied.

90.     Thereafter, on December 11, 2020, the Newmans provided American Home with bids and estimates quantifying the extra expenses (not including the cost to repair the existing roof trusses) needed to repair and replace the Property to code based on like kind and quality, totaling at least $4,412,463.60.

91.     As explained in the letter, the Newmans engaged an architect as well as the services of the original builder of the home, Frank Steele, to identify the laws and ordinances that they must obey in repairing the Property and to quantify (largely through third-party bids) the extra expense that would be incurred to repair the home. Among other things, those estimated expenses included $626,008 for demolition, removal, and rebuilding of window/door openings to accommodate code compliant products; $682,904 for mold abatement as required by building codes; $575,978.45 for windows and doors (the net difference between the appraisal award and code-compliant products); $281,584.38 for roof truss hurricane anchoring and strapping; $308,992.84 for pre-cast removal and replacement (also the difference between the appraisal award and code-compliant products), all of which was supported by bids provided to American Home.

92.     American Home said that its experts would review the submissions, but the insureds heard nothing further from their insurer on this issue for nearly five months.

93.     More than five months after the Newmans supplemented their claim, on December 16, 2020, American Home asked to re-inspect the Property.

94.     On January 14, 2021, engineers for both parties conducted an onsite inspection to assess the ordinance or law issues.

95.     On February 8, 2021, months after receiving the requested supporting documents from the Newmans for their L&O claim, American Home finally provided its engineering report from J.S. Held and later submitted corresponding estimates.

96.     As framed by J.S. Held's report, American Home took the position that "[t]he repair work being performed at the Newman residence is classified as a Repair and therefore the specific code requirements being cited would be recognized as owner directed betterments and not required code upgrades."

97.     A review of American Home's report gave the impression that it was evaluating a completely different Property.

98.     American Home's estimates were also inaccurate and misleading—for instance, the J.S. Held estimate oddly stated that "code upgrade" costs were *excluded* from the estimate, and an estimate as to the window-related costs assumed that a single small 32 sq. ft. window opening was prevalent throughout the Property even though the openings were roughly double that, and the total cost (under J.S. Held's methodology) would have been approximately $3.5 million to reconstruct all 126 openings.

99.     American Home also all but ignored the extensive costs needed for structural issues (including repairs to masonry walls and concrete pilings and rebuilding the sheer walls for needed additional lateral and vertical uplift and support) and the resulting damage to the hardscape that would result from the use of heavy equipment in performing this work. American Home's engineer oddly stated that since the window/door and roof work would not involve structural modification or specialized equipment, "it is unclear why the extensive use of equipment would be required?"

100.    Piecing together the various unclear estimates provided by its consultant, it appeared that American Home was valuing the L&O losses to be below $2 million.

101.    On March 12, 2021, Trillas Consulting Engineers provided its engineering report, which supported GFA's earlier report detailing the structural damage to the Property.

102.    On March 29, 2021, the Newmans asked American Home to provide a dollar figure that it would actually pay to satisfy the outstanding portion of the claim.

103.    In response, despite already having its own expert report and estimates, American Home baselessly demanded more documentation from its insureds.

104.    Upon information and belief, this served no purpose other than to needlessly delay payment of the claim.

105.    The Newmans explained that American Home had all the documents it required to make a determination of law and ordinance damages and once again requested the dollar figure it would pay to satisfy the outstanding portion of the claim.

106.    The parties attended a mediation on June 11, 2021, which, like all of the Newmans' previous efforts to obtain closure, was not successful.

107.    Prior to mediation on May 27, 2021, the Newmans demanded appraisal for the law and ordinance portion of their claim.

108.    Initially, American Home baselessly objected to the Newmans' named appraiser by claiming that he was incompetent to serve as an appraiser on building code issues even though he had also served as the appraiser on the building portion of the claim. This meritless objection required additional and unnecessary time and conferrals that served only to further delay the resolution of the Newmans' claim and increase their costs. American Home later relented, and consented to the Newmans' chosen appraiser.

109.    This concession, however, was tied to an agreement insisted upon by American Home that the original umpire, Jon Doan, would be replaced by a new umpire unfamiliar with the property, Brian Haden from Texas. This naturally led to delay and increased costs as Haden had to learn the issues with the property anew.

110.    On December 22, 2021, seven months after the Newmans' appraisal demand,  the appraisal panel issued an award in the Newmans' favor relating to the L&O portion of the claim in the amount of $5,827,300.84—again dwarfing the lowball estimates provided by American Home. Notably, the new umpire signed the award, providing a *de facto* second opinion that American Home's estimates were necessarily far short of what is required to restore the home to its pre-loss condition.

111.    Finally, on February 1, 2022, American Home paid $4,617,532.40 for the L&O portion of the Newmans' claim, including the cost of living expenses added to the award amount.

112.    As against an initial opinion by American Home that the loss did not exceed the deductible, these awards individually and collectively clearly demonstrate the insurer's failures to act in good faith. Still, the total of all awards issued by disinterested third parties in the Newmans' favor, $17,370,461.80, is so vastly in excess of any offer or payment made by American Home as to be itself probative of the insurer's lack of good faith claims handling and failure to pay when it could and should have done so had it fairly and honestly with due regard for the Newmans' interests.

### The Compensatory Damages

113.    As a foreseeable result of American Home's acts and failures to act which violate the civil remedies statutes, the Newmans have been damaged, including the following;

a. The difference between the L&O appraisal award and the American Home Policy's coverage limit for that award;

b. The Newmans' incurred alternative living expenses less the amount already paid by American Home;

c. The reasonable rental value of the Property either as an alternative to ALE or in addition to it as may be permitted under applicable law;

d. Expenses incurred and to be incurred to maintain the Property since notice of the loss, including taxes, insurance, utilities, maintenance and up-keep, security and security systems, as well as the salaries of those maintaining the Property;

e. The costs of three appraisals, including appraiser and umpire fees;

f. The public adjuster fees and costs paid or owed to or through Stellar;

g. The costs of experts and consultants hired to assist in determining cause of loss, scope of loss, reconstruction methods and means, code issues, and estimates of costs of repair, and other investigative and remedial costs (including mitigation and repair costs);

h. Unpaid mold related damage caused by American Home's delay;

i. The lost time value of payments that should have been made but were not;

j. Legal fees and ancillary costs incurred to protect the Newmans' rights, guide them during the appraisal processes, and perfect their interests under the Policy and applicable law. In addition, as fees and costs of this action are treated by law as a species of damage, fees and costs incurred in this action as well; and

k. Pre-judgment and post-judgment interest on each of the foregoing as allowed by law.

114.    American Home's lack of good faith and unfair claims handling acts and practices foreseeably caused the damages suffered by the Newmans.

115.    The Newmans have retained the undersigned attorneys and have agreed to pay them a reasonable fee for their services in this action.

116.    All conditions precedent to this action have been satisfied, have occurred, or have been waived.

**COUNT I**
**CIVIL REMEDY PURSUANT TO FLA. STAT. § 624.155(1)(b)**

117.    The Newmans re-allege paragraphs 1 through 116.

118.    This is an action for damages pursuant to Fla. Stat. § 624.155(1)(b).

119.    As detailed above, American Home failed to timely pay the Newmans' claim when, under all the circumstances, it could and should have done so had it acted fairly and honestly and with due regard for their interests, in violation of Fla. Stat. § 624.155(1)(b)1.

120.    American Home's failure to act in good faith is evidenced in part (and among other things) by its failure to pay the claim for amounts, including those offered by the Newmans, that it could and should have paid had it acted fairly and honestly towards the Newmans. Indeed, American Home's offers were dwarfed individually and collectively by the subsequent appraisal awards setting the amount of loss for the claim.

121.    Instead, American Home's representatives acted in the best interest of American Home, failing to promptly and reasonably investigate the claim, offering to pay lowball estimates, and rejecting reasonable offers to settle the claim.

122.    The Newmans filed the First and Second CRNs, which detailed these violations in compliance with Florida law and afforded American Home an opportunity to cure the violations.

123.    The violations were not timely cured.

124.     The Newmans' claims was subsequently resolved in their favor as reflected by three

separate appraisal awards dwarfing any estimates or offers made by American Home.

125.     The Newmans have suffered damages set forth in paragraph 113 as a foreseeable

result of the claims handling practices detailed above.

**COUNT II**
**UNFAIR CLAIM SETTLEMENT PRACTICES**
**PURSUANT TO FLA. STAT. §§ 624.155(1)(a) & 626.9541(1)(i)**

126.     The Newmans re-allege paragraphs 1 through 116.

127.     This is an action for damages under Fla. Stat. § 624.155(1)(a) and the incorporated

sections of the Unfair Insurance Trade Practices Act, Fla. Stat. § 626.9541(1)(i).

128.     In investigating and adjusting the Newmans' claim, American Home made material

misrepresentations to the Newmans, which, upon informed belief, were made for the purpose and

with the intent of effecting a settlement of the claim, loss, or damage on less favorable terms than

those provided in and contemplated by the Policy, in violation of Fla. Stat. §§ 626.9541(1)(i)2 and

626.9541(1)(i)3.b.

129.     American Home's material misrepresentations include, but are not limited to:

a.   False statements and estimates at the outset regarding the damage to the roofs,

windows, and doors, including American Home's initial position after the claim

was reported that the loss fell below the applicable deductible (a position later

shown to be false by many millions of dollars);

b.   False statements and estimates made on or about December 5, 2017, including

in estimates prepared by its agents HAAG and Mr. Estep claiming that the roof

could be repaired for just under $30,000 and that the Newmans' windows and

doors could be repaired for just under $9,000 (a position later shown to be false

- 21 -

by many millions of dollars and, at the time, was contradicted by quotes that American Home had in its possession);

c.  False statements and estimates claiming that the windows were not damaged by Hurricane Irma, that the doors sustained a mere $2,880 in damage, and that the interior water damage was pre-existing and "minimal" as claimed by its agent Daniels in a report dated March 6, 2019;

d.  False statements concerning the condition and remaining useful life of the tile roofs, which were used to support a lowball $8,350 damage estimate, including false statements based on the report and estimates prepared by Daniels falsely claiming that the life span of the tile roof was 18 years, akin to cheaper roofs for tract homes rather than like kind and quality to the custom tile roofs owned by the Newmans, which last 30-40 years, and claiming that less than 25% of the roof was damaged to avoid application of the "25% rule" requiring complete replacement under the Florida Building Code when it was clear that more than 25% of the tile roof—indeed, more than 50%—was damaged; and

e.  The misrepresentations described in paragraphs 1 through 112.

130.  Upon information and belief, similar misrepresentations and other statutory claims handling violations occur with such frequency as to indicate American Home's business practices as it relates to similar claims, in that they are either (1) repeated with such frequency as to indicate general business practices in other claims or (2) expressions of American Home's view of reasonable and appropriate claims handling in similar circumstances.

131.  The Newmans filed the First and Second CRNs, which detailed these violations in compliance with Florida law and afforded American Home an opportunity to cure the violations.

132.    The violations were not timely cured.

133.    The Newmans' claims was subsequently resolved in their favor as reflected by three separate appraisal awards dwarfing any estimates or offers made by American Home.

134.    The Newmans have suffered damages as set forth in paragraph 113 as a foreseeable result of the claims handling practices detailed above.

### COUNT III
### UNFAIR CLAIM SETTLEMENT PRACTICES
### PURSUANT TO FLA. STAT. §§ 624.155(1)(a) & 626.9541(1)(i)

135.    The Newmans re-allege paragraphs 1 through 116.

136.    This is an action for damages under Fla. Stat. § 624.155(1)(a) and the incorporated sections of the Unfair Insurance Trade Practices Act, Fla. Stat. § 626.9541(1)(i).

137.    American Home engaged in unfair claims handling in that it failed to conduct a timely and reasonable investigation of the Newmans' claim, including as to the cause and amount of loss, failed to implement standards for the proper investigation of claims, failed to act promptly in response to communications relating to the claim, and failed to provide timely and reasonable explanations concerning the nature and necessity of its requests for information, in violation of Fla. Stat. §§ 626.9541(1)(i)3.a., 3.c. & 3.h.

138.    American Home violated these duties in several ways, including, but not limited to:

a.   Taking months to assemble a team to inspect the Property after receiving timely notice of the claim;

b.   Engaging unqualified, inexperienced, or untrained investigators, including but not limited to Mr. Estep;

c.   Shifting the cost of conducting a full, fair, unbiased, and prompt investigation to the Newmans;

d.   Taking nearly six months after the Newmans first made the claim before issuing any payment whatsoever ($202,575.91);

e.   Reassigning the claim to a new adjuster nearly a year after the claim was made and then waiting another three months before fully re-inspecting the Property;

f.   Failing to conduct a full and fair investigation of the real and personal property damage and ALE and, as a result, taking the position that the damage was many millions of dollars less than the actual amount needed to restore the Property to its pre-loss condition;

g.   Telling the insureds it would review their submissions for L&O costs, but then failing to communicate further on the issue for nearly five months and only then asking to re-inspect the Property on December 16, 2020;

h.   Taking over six months after receiving notice of the Newmans' L&O claim to advise the insureds of its monetary position;

i.   Failing to reasonably investigate and account for the extensive costs needed for structural issues and damage to the hardscape that would result from the use of heavy equipment in addressing those issues as required to comply with building codes;

j.   Demanding additional documentation in response to the insureds' request that American Home identify the dollar figure that it would pay to satisfy the L&O portion of the claim despite already having the necessary information, including its own expert report and estimates; and

     k.   Asserting baseless objections to the Newmans' chosen appraiser, requiring time and conferrals to resolve the objections, further delaying resolution of the claim and increasing the insureds' costs, only to later relent and agree to the appraiser

     l.   The violations described in paragraphs 1 through 112.

139. American Home was obligated to assist the Newmans in perfecting and quantifying their claim consistent with industry best practices and the adjuster's code of ethics. Instead, the American Home representatives acted in the best interest of American Home, failing to adequately and promptly investigate the claim and offering to pay lowball estimates rather than conducting a full and fair investigation, which, as American Home surely understood, would have required a huge expenditure of time and money.

140. A reasonable claim investigation under the Policy required a complete investigation by American Home of both the causes of loss and the damages both covered and excluded by the Policy terms. Instead, upon information and belief, American Home encouraged its adjusters and claims investigators to save American Home money at the expense of its insureds through lowball estimates.

141. American Home's actions in failing to fully and fairly investigate the claim were taken to save American Home money and pass the expense of a full investigation onto its insureds. The Newmans were forced to retain multiple experts to evaluate the causes of loss and the causes of their damages as a direct result of American Home's misconduct.

142. Upon information and belief, the aforementioned actions occur with such frequency as to indicate American Home's business practices as it relates to similar claims, in that they are either (1) repeated with such frequency as to indicate general business practices in other claims or

(2) expressions of American Home's view of reasonable and appropriate claims handling in similar circumstances.

143. The Newmans filed the First and Second CRNs, which detailed these violations in compliance with Florida law and afforded American Home an opportunity to cure the violations.

144. The violations were not timely cured.

145. The Newmans' claims was subsequently resolved in their favor as reflected by three separate appraisal awards dwarfing any estimates or offers made by American Home.

146. The Newmans have suffered damages as set forth in paragraph 113 as a foreseeable result of the claims handling practices detailed above.

## PRAYER FOR RELIEF
### (ALL COUNTS)

WHEREFORE, Plaintiffs demand entry of judgment against American Home for damages and other relief, including but not limited to the compensatory damages alleged above.

Based on discovery in this case, the Newmans may amend their complaint to assert the right to recover punitive damages, as the acts, failures to act, and misconduct of the AIG Private Client Group occur with such frequency as to indicate a general business practice. Moreover, as Section 626.9541(1)(i)2 is functionally a statutory fraud claim, punitive damages may be assessed for a violation of that sub-section without having to prove an indicated general business practice.

## JURY TRIAL DEMAND

Plaintiffs demand a trial by jury in this matter.

DATED this 31st day of March, 2022.

Respectfully submitted,

/s/ *R. Hugh Lumpkin*
**R. Hugh Lumpkin**
Florida Bar No. 0308196
hlumpkin@reedsmith.com

**Christopher T. Kuleba**
Florida Bar No. 105302
ckuleba@reedsmith.com
**Garrett Nemeroff**
Florida Bar No. 111675
gnemeroff@reedsmith.com

REED SMITH, LLP
1001 Brickell Bay Drive, 9th Floor
Miami, FL  33131
Tel: 786-747-0200
Fax: 786-747-0299
*Counsel for Plaintiff*