# EXHIBIT C

# EXHIBIT C



## Civil Remedy Notice of Insurer Violations

| | |
|---|---|
| Filing Number: | 433822 |
| Filing Accepted: | 5/6/2019 |

**Warning!** Information submitted as part of this civil remedy notice is a public record. Data entered into this form will be displayed on the DFS website for public review. Please DO NOT enter Social Security Numbers, personal medical information, personal financial information or any other information you do not want available for public review.

☑ The submitter hereby states that this notice is given in order to perfect the rights of the person(s) damaged to pursue civil remedies authorized by Section 624.155, Florida Statutes.

### Complainant

| | |
|---|---|
| Name: | JOEL AND EDITH NEWMAN |
| Street Address: | 355 SOUTH OCEAN DRIVE |
| City, State Zip: | GOLDEN BEACH, FL  33160 |
| Email Address: | HLUMPKIN@REEDSMITH.COM |
| Complainant Type: | Insured |

### Insured

| | |
|---|---|
| Name: | JOEL AND EDITH NEWMAN |
| Policy #: | PCG 0002409017 |
| Claim #: | 00575816 |

### Attorney

| | |
|---|---|
| Name: | R. HUGH LUMPKIN |
| Street Address: | REED SMITH, LLP, 1001 BRICKELL BAY DRIVE, SUITE 900 |
| City, State Zip: | MIAMI, FL  33131 |
| Email Address: | HLUMPKIN@REEDSMITH.COM |

### Notice Against

| | |
|---|---|
| Insurer Type: | Authorized Insurer |
| Name: | AMERICAN HOME ASSURANCE COMPANY |

Please identify the person or persons representing the insurer who are most responsible for/knowledgeable of the facts giving rise to the allegations in this notice.

**THE INSURED DOES NOT CURRENTLY KNOW WHO IS THE MOST RESPONSIBLE FOR OR HAS THE MOST KNOWLEDGE OF THE FACTS GIVING RISE TO THIS NOTICE, BUT THE FOLLOWING PERSONS HAVE SOME RESPONSIBILITY OR KNOWLEDGE: PATRICK KELLER - CLAIMS ANALYST, AIG CLAIMS INC.;**

| | |
|---|---|
| Type of Insurance: | HOMEOWNER |



# Civil Remedy Notice of Insurer Violations

Filing Number: **433822**

## Reason for Notice

Reasons for Notice:

**Claim Delay**

**Unfair Trade Practice**

**PURSUANT TO SECTION 624.155, F.S.** please indicate all statutory provisions alleged to have been violated.

| | |
|---|---|
| 624.155(1)(b)(1) | Not attempting in good faith to settle claims when, under all the circumstances, it could and should have done so, had it acted fairly and honestly toward its insured and with due regard for her or his interests. |
| 624.155(1)(b)(3) | Except as to liability coverages, failing to promptly settle claims, when the obligation to settle a claim has become reasonably clear, under one portion of the insurance policy coverage in order to influence settlements under other portions of the insurance policy coverage. |
| 626.9541(1)(i)(2) | A material misrepresentation made to an insured or any other person having an interest in the proceeds payable under such contract or policy, for the purpose and with the intent of effecting settlement of such claims, loss, or damage under such contract or policy on less favorable terms than those provided in, and contemplated by, such contract or policy. |
| 626.9541(1)(i)(3)(a) | Failing to adopt and implement standards for the proper investigation of claims. |
| 626.9541(1)(i)(3)(b) | Misrepresenting pertinent facts or insurance policy provisions relating to coverages at issue. |
| 626.9541(1)(i)(3)(c) | Failing to acknowledge and act promptly upon communications with respect to claims. |
| 626.9541(1)(i)(3)(d) | Denying claims without conducting reasonable investigations based upon available information. |
| 626.9541(1)(i)(3)(f) | Failing to promptly provide a reasonable explanation in writing to the insured of the basis in the insurance policy, in relation to the facts or applicable law, for denial of a claim or for the offer of a compromise settlement. |
| 626.9541(1)(i)(3)(g) | Failing to promptly notify the insured of any additional information necessary for the processing of a claim. |
| 626.9541(1)(i)(3)(h) | Failing to clearly explain the nature of the requested information and the reasons why such information is necessary. |
| 626.9541(1)(i)(3)(i) | Unfair claim settlement practices |

Reference to specific policy language that is relevant to the violation, if any. If the person bringing the civil action is a third party claimant, she or he shall not be required to reference the specific policy language if the authorized insurer has not provided a copy of the policy to the third party claimant pursuant to written request.

**FLORIDA HOMEOWNERS DECLARATIONS PAGE**

**Policy Number:**  **Policy Period:**
PCG 0002409017    09/22/2016 – 09/22/2017

DFS-10-363
Rev. 10/14/2008

**Name of Insured and Mailing Address:**

**Joel Newman**
**Edith Newman**
**1160 NW 163rd Drive**
**Miami, FL 33169**

…

**Summary of Coverage by Location:**

**355 South Ocean Blvd., Golden Beach, FL 33160**

**COVERAGE PAYMENT BASIS COVERAGE LIMIT**
**House Extended Rebuilding Cost $14,799,783**
**Other Permanent Structures Extended Rebuilding Cost $251,731**
**Contents Replacement Cost $2,484,409**
**Loss of Use  $4,439,935**
**… … …**
**Rebuilding to Code (Law and Ordinance – 30%)  $4,439,935**

…

**Hurricane Deductible:   $295,996                                          (2% of House coverage)**

\* \* \*

**PART I – DEFINITIONS**

**Damages means the sum required to satisfy any claim, covered by this policy, whether settled and agreed to in writing by us or resolved by judicial review.**
**…**
**Fungi means any type or form of fungus, including but not limited to all forms of mold or mildew, and any myotoxins, spores, accents, vapors, gas or substance, including any by-products produced or released by fungi.**
**…**
**Hurricane means a storm system that has been declared to be a hurricane by the National Hurricane Center of the National Weather Service….**
**…**
**Occurrence means: … A loss or an accident, to which this insurance applies, including continuous or repeated exposure to substantially the same general harmful conditions, which occurs during the Policy Period and results in … property damage.**

**Other Permanent Structures means outdoor structures you own that are situated on the grounds of your residence.**
**…**
**Property Damage means physical injury to, destruction of, or loss of use of tangible property and the resulting loss of its use.**

**Reconstruction Cost means the lesser of the amount at the time of the loss required to:**
**a. Restore or repair a structure; or**
**b. Replace or rebuild a structure at the same location;**

**With materials of like kind and quality, whether or not repair or replaced.  Reconstruction cost does not include deduction for depreciation or any amount required for the excavation, replacement or stabilization of land under or around a structure.**
**…**
**Residence means any of the following which is listed on the Declarations Page:**

**a. Any house, other permanent structures and grounds that you own.**

...
**PART II – PROPERTY**

DFS-10-363
Rev. 10/14/2008

**A. Insuring Agreement**

**This policy covers you against all risks of direct physical loss or damage to your house, contents, and other permanent structures unless an exclusion applies.**

**B. Payment of a Loss**

**1. Amount of coverage for Your House and Other Permanent Structures**

**The amount of coverage for each house and for each other permanent structures at each location shown on the Declaration Page is determined by the payment basis shown on the Declarations Page:**

**a. Extended Rebuilding Cost Coverage**

**We will pay Extended Rebuilding Cost when shown on the Declarations Page of this policy. Extended Rebuilding Cost coverage means that for a covered loss we will pay the reconstruction cost of your house or other permanent structures, for each occurrence. If the reconstruction cost of your house as shown on the Declarations Page, we will pay up to 50% more than this amount of coverage, if necessary, for the reconstruction cost. If the reconstruction cost of your other permanent structures exceeds the amount of coverage for your other permanent structures as shown on the Declarations Page, we will pay up to 50% more than this amount of coverage, if necessary, for the reconstruction cost….**

**…**

**4. Pairs, Sets and Parts**

**For a covered loss to a pair or set, we will pay whichever is less:**

**a. The cost to replace the … damaged property;**
**b. The cost to restore or repair the damaged property to its pre-loss condition;**
**c. The difference between the market value of the pair or set before the loss and after the loss; or**
**d. The amount of coverage.**

**However, we will pay you the full replacement cost of the entire pair or set if you agree to surrender the remaining article(s) of the pair or set to us.**
**…**

**C. Additional Coverages**

**These coverages are offered in addition to the amount of coverage shown on the Declarations Page unless stated otherwise. Your deductible applies to these coverages unless stated otherwise. Exclusions are described in section D. Exclusions and limits of liability, are described in section B., 5. Special Limits of Liability apply to these coverages.**

**1. Additional Living Expense**

**As described below, under certain conditions when your residence cannot be lived in because of a covered loss to your house or, if applicable, your contents, we provide coverage for additional living expenses, loss of fair rental value, and forced evacuation expenses. The maximum amount we will pay for all additional living expenses combined for each occurrence is 30$ of the house coverage if the residence where the loss occurs is a house….**

**a. Extra Living Expense**

**If a covered loss makes your residence uninhabitable, we cover any reasonable increase in living expenses incurred by you to maintain your household's usual standard of living. Payment will continue for the shortest reasonable amount of time necessary to restore your residence to a habitable condition or for your household to permanently locate elsewhere.**

**…**

**7. Debris Removal**

**We cover the reasonable expenses you incur to remove debris due to a covered loss and the property that**

DFS-10-363
Rev. 10/14/2008

**caused the covered loss.**

…

**2.  Rebuilding to Code**

**We will pay the extra expenses to obey any law or ordinance that regulates the repair, rebuilding or demolition of damaged property caused by a covered loss subject to the following:**

**a. If the loss is to a house, we will pay up to 30% of the amount of coverage shown on the Declarations Page for that house;**

**b. If the loss is to an other permanent structure, we will pay up to 30% of the amount of coverage shown on the Declarations Page for other permanent structures at that location**

**\* \* \***

**PART IV - CONDITIONS**
…

**B.  Your Duties After a Loss**

**In the event of an occurrence which is likely to involve this policy, or if you or any other insured person under this policy is sued in connection with an occurrence which may be covered under this policy, you or an insured person must;**

**1. Give prompt notice to us or your agent or broker.**

…
**4.    Protect the property from further damage.  If repairs to the property are
required, you must:**

**a. Make reasonable and necessary repairs to protect the property; and
b. Keep an accurate record of all repair expenses.**

**5. Provide us with bills, receipts and related documents.**

**6. As often as we reasonably require:**

**a. Show the damaged property;
b. Provide us with records and documents we request; and
c. Submit to separate examination under oath.**

**7. Send us within sixty (60) days of our request, your signed sworn proof of loss which sets forth, to the best of your knowledge:**

**a. The time and cause of loss;
b. The interest of all others in the property;
c. Other insurance which may cover the loss; and
d. The dollar amount being claimed as loss.**

**8. Provide us with the names and addresses of any known persons injured and any available witnesses.**

…

**M.   Mediation or Appraisals**

  **If you and we fail to agree on the amount of loss, either may:**
   …

**b. Demand an appraisal of the loss.  In this event, each party will choose a competent appraiser, within twenty (20) days after receiving a written request from the other.  The two appraisers will choose an umpire.  If they cannot agree upon an umpire within fifteen (15) days, you or we may request that the choice be made by a judge of a court of record in the state where the "residence premises" is located.  The appraisers will separately set the amount of the loss.  If the appraisers submit a written report of an agreement to us,**

DFS-10-363
Rev. 10/14/2008

the amount agreed upon will be the amount of loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will set the amount of the loss.

**Each party will:**

i. Pay its own appraiser; and
ii. Bear the other expenses of the appraisal and umpire equally.

**If, however, we demanded the mediation and either party rejects the mediation results, you are not required to submit to, or participate in, any appraisal of the loss as a precondition to action against us for failure to pay the loss.**

---

To enable the insurer to investigate and resolve your claim, describe the facts and circumstances giving rise to the insurer's violation as you understand them at this time.

**The insured property is a 5 bedroom, 8 bathroom, 25,289 square foot property located in Golden Beach, Florida (the "Property"). American Home Assurance Company ("AIG") issued the above-referenced policy covering, among other things, hurricane-related damage occurring during the September 22, 2016 to September 22, 2017 policy period (the "Policy"). Under the Policy, losses are to be valued at the cost to rebuild the damaged property and, where damaged property is part of a set, AIG agreed to pay the full replacement cost of the entire set where the insureds are willing to surrender the remaining (undamaged) articles of the set to AIG. The Policy also provides "Ordinance or Law" coverage, which covers costs in addition to the cost to rebuild the property resulting from the need to conform to modern building codes, laws, and/or ordinances.**

**On or about September 10, 2017, Hurricane Irma struck the southern coast of Florida. The storm caused extensive covered damage to the Property, including but not limited to damage to the interior and exterior of the buildings, the Property's windows, doors, roofing systems, security shutters, cooling systems, and other exterior envelope components. The Property suffered significant water intrusion as a result of the storm, particularly through the Property's roofs and windows. As a result of that water intrusion and AIG's delay, mold has accumulated throughout portions of the Property.**

**The insureds undertook immediate inspection efforts to determine the cause, scope and extent of damage and quell additional losses. Estimates were obtained from several (and, for purposes of cost suppression, sometimes redundant) expert consultants, the Insureds' have conservatively estimated their total property damage to be $7,369,419.14. Due to the resulting condition of the property and the need to make repairs, the Insureds have also been forced to find alternative living arrangements. To date, the insureds have incurred alternate living expenses totaling $80,000.00 (exclusive of a $40,000.00 security deposit). By the end of the Insureds' 12-month lease, that figure will increase to $520,000.00 (inclusive of security deposit).**

**The insureds timely reported the claim to AIG, and AIG assigned Claim No. 575816 ("Claim"). AIG dragged its feet, taking months to compile a team to investigate and even longer to prepare an estimate of what it believed was the extent of covered damage. On October 2, 2018, AIG re-assigned the Insureds' claim to another adjuster. Months after the claim was reported, AIG estimated only minimal covered damages to the Insureds' property. AIG later reconsidered its valuation, but continued to severely underestimate the extent of the Insureds' covered loss, offering a mere $202,575.91 (net of the policy's $295,996.00 deductible). AIG again amended its position, acknowledging $981,274.90 in covered damages and offering an additional $482,702.99 toward the Insureds' loss on April 9, 2019. AIG's current estimate still falls well short of the damages sustained. Nineteen months a have passed since Hurricane Irma made landfall, and AIG has collectively offered to pay only $685,278.90 – $6,764,140.24 less than the $7,449,419.14 in total Irma-related property damages identified by the Insureds' third-party experts and incurred alternate living expenses.**

**The Insureds have fully cooperated with AIG's investigation, opening their home to AIG for inspection and providing volumes of repair estimates, invoices, analyses and other documentation in support of their claim. The Insureds have retained multiple consultants to evaluate the cause and extent of damage and estimate the expenses required to rebuild to ensure their claim is fair and accurately describes the extent of covered loss caused by Hurricane Irma. On March 6, 2018, the Insureds submitted a partial proof of loss (the "POL") identifying only the portion of loss AIG at that point had agreed was covered. Additional documents confirming the full extent of the Insureds' $7,449,419.14 loss have since been provided to AIG. As of the date of this civil remedy notice, all documents reasonably requested by AIG and within the Insureds' possession have been provided to AIG, confirming the full extent of the Insureds' loss.**

**The Insureds' cooperation and has been met by AIG's delay and repeated attempts to underpay. AIG misconstrues the relevant language of its policy informing what is due and owing the Insureds. AIG's lack of timely payment has forced the Insureds to spend their own funds to make temporary and permanent**

DFS-10-363
Rev. 10/14/2008

repairs. Indeed, the portions of the roof and windows damaged by Hurricane Irma continued to leak and let water into the home, posing additional risk of damage that the Insureds are forced to mitigate at their own expense. The Insureds are now faced with the prospect of replacing the entirety of the damaged property without any promise of payment from AIG.

Since receiving timely notice of the Insureds' claim, AIG has failed to: timely pay the Insureds' claim when, under all the circumstances, it could and should have done so had it acted fairly toward the Insureds in violation of Sections 624.155(1)(b)(1) and (1)(b)(3); act promptly in response to communications relating to the Insureds' claim in violation of Section 626.9541(1)(i)(3)(c); satisfy its obligations under the policy based on AIG's failure to conduct a reasonable investigation based upon available information and/or AIG's apparent failure to implement standards for the proper investigation and adjustment of claims in violation of Sections 626.9541(1)(i)(3)(a) and (i)(3)(a); properly represent the scope and application of relevant policy provisions in violation of Sections 626.9541(i)(3)(b) and 626.9541(1)(i)(2); failed to provide a timely and reasonable explanation for the nature and necessity of its information requests and failure to pay in violation of Sections 626.9641(1)(i)(3)(f) - (h). AIG, acting in its own best interest and in conformity with its general business practices, has instead repeatedly delayed resolution of and undervalued this claim and has gained financial advantage in doing so. AIG has all the documentation necessary to adjust and pay the claim, and it should do so without further delay. Upon information and belief, these actions occur with such frequency as to indicate AIG's business practices as it relates to similar claims, in that they are either (1) repeated with such frequency as to indicate a business practices in other claims or (2) expressions of AIG's view of reasonable, good faith claims handling in similar circumstances.

In order to cure the circumstances giving rise to the violations described in this Notice, AIG must pay $6,468,144.24 – consisting of the Insureds' $7,449,419.14 in total property damage and incurred ALE expenses less the Insureds' $295,996.00 deductible and the $685,278.90 AIG has paid to date – together with interest as may be allowed by law.

This Notice does not replace the Notice previously filed and assigned Filing Number 423689.

## Comments

| User Id | Date Added | Comment |
|---|---|---|
| steebagy@thetmlaw.com | 07-01-2019 | July 1, 2019<br><br>Electronic Filing<br>Florida Department of Financial Services<br>Consumer Assistance/Civil Remedy Section<br>Larson Building<br>200 E. Gaines Street<br>Tallahassee, FL 32399-0322<br><br>Insureds: Joel and Edith Newman<br>Policy No.: PCG 0002409017<br>Claim No.: 575816<br>Date of Loss: 09/10/17<br>CRN Filing No.: 433822<br><br>Dear Sir or Madam:<br><br>Please be advised that this law firm represents American Home Assurance Company (hereinafter "AHAC") with respect to the above-referenced matter. This is AHAC's response to the Civil Remedy Notice of Insurer Violations (hereinafter "Civil Remedy Notice") filed on or about May 6, 2019, in relation to Claim Number 575816 (hereinafter "Claim") under the policy issued by AHAC to Joel and Edith Newman (hereinafter "Insureds"), bearing Policy Number PCG 0002409017 (hereinafter "Policy").<br><br>AHAC denies each and every allegation contained within the Civil Remedy Notice, including but not limited to those related to Sections 624.155(1)(b)(1), 624.155(1)(b)(3), 626.9541(1)(i)(3)(a), 626.9541(1)(i)(3)(b), 626.9541(1)(i)(3)(c), 626.9541(1)(i)(3)(d), 626.9541(1)(i)(3)(f), 626.9541(1)(i)(3)(g), 626.9541(1)(i)(3)(h), and 626.9541(1)(i)(3)(i) of the Florida Statutes. Moreover, AHAC handled this Claim pursuant to appropriate standards governing the investigation of claims, did not and has not misrepresented pertinent facts or insurance policy provisions relating to coverages at issue, and has complied with and continues to comply with all other requirements pursuant to Section 626.9541, Florida Statutes and Section 624.155, Florida Statutes.<br><br>By way of background, on or about October 12, 2017, it was |

reported that the subject insured property, located at 355 South Ocean Boulevard, Golden Beach, Florida 33160 (hereinafter "Insured Property"), sustained damage due to Hurricane Irma on or about September 10, 2017. This Claim involves a substantial amount of claimed damages, exceeding $7,000,000.00, as set forth in the Insureds' Civil Remedy Notice. After receiving notice of the loss, AHAC began its investigation of the subject claim and assigned it Claim Number 575816. AHAC retained Haag Construction Consulting, Daniels Brothers, Inc., LTL Builders, Inc., Knopf and Associates, and HEI Systems to aid in its investigation.

AHAC ultimately determined there was coverage for the Insureds' Claim. Thus, after application of the applicable $295,996.00 deductible, AHAC tendered payments to the Insureds collectively totaling $685,278.90. The Insureds' allegations that these payments were delayed is patently false as AHAC, its investigators and/or its adjusters repeatedly requested documents supporting the Insureds' claimed damages and could not issue undisputed payments until receipt of same. After multiple requests for said documents, and several months of waiting, AHAC finally received the requested documentation and was able to issue the undisputed payment. More specifically, Haag Construction Consulting inspected the Insured Property on or about October 26, 2017, prepared an estimate on or about December 5, 2017, totaling a net claim of $202,575.91 after application of the applicable deductible, and AHAC provided Haag Construction Consulting's estimate to the Insureds' public adjuster, Stellar Public Adjusting Services, on or about January 23, 2018. During this time, AHAC, its investigators and/or its adjusters repeatedly requested supporting documents. On March 6, 2018, the Insureds executed a "partial" Sworn Statement in Proof of Loss totaling a net claim of $202,575.91 pursuant to Haag Construction Consulting's estimate. Upon receipt of same, on or about March 19, 2018, AHAC issued a payment to the Insureds totaling $202,575.91 pursuant to Haag Construction Consulting's estimate.

Following AHAC's payment, AHAC continued to investigate the Claim and the Insureds' claimed damages. Daniels Brothers, Inc. performed a site visit at the Insured Property with Stellar Public Adjusting Services to determine the extent of claimed damage and, in light of the extensive amount of claimed damages, began to schedule a re-inspection with Stellar Public Adjusting Services, Frank L. Steele & Company (the Insureds' general contractor), LTL Builders, Inc., Knopf and Associates, and HEI Systems. Due to scheduling conflicts, the re-inspection did not occur until January 30, 2019. Thereafter, Daniels Brothers, Inc. prepared an estimate totaling $981,274.90 RCV. Taking into account the $202,575.91 prior payment and $295,996.00 deductible, AHAC tendered a supplemental payment to the Insureds in the amount of $482,702.99 on or about April 4, 2019.

On April 9, 2019, AHAC's counsel sent the Insureds' public adjuster, Stellar Public Adjusting Services, correspondence regarding the supplemental payment and advising that as the Insureds were still in dispute as to the amount of the loss, AHAC was willing to enter into appraisal. On May 6, 2019, AHAC sent the Insureds' counsel, Hugh Lumkpin Esquire of Reed Smith LLP, a letter invoking appraisal under the Policy. AHAC named Richard Collins as its appraiser. The Insureds subsequently named George Keys as their appraiser. On June 24, 2019, the appraisal panel inspected the Insured Property. The appraisers also selected an umpire. The appraisal process remains ongoing.

In conclusion, as set forth herein, the Civil Remedy Notice fails to comply with the pleading requirements of Section 624.155, Florida Statutes. The alleged violation in the Civil Remedy Notice is inaccurate, unfounded and expressly denied by AHAC. AHAC has not engaged in the conduct alleged nor have the Insureds come forth with any sufficient evidence to justify their allegations. In light of the foregoing, AHAC has not acted in bad faith in handling the Insureds' Claim and has acted in accordance with the governing policy and pursuant to Florida law.
We trust that this correspondence addresses any concerns or questions that you may have regarding the Civil Remedy Notice filed. Please feel free to contact us if you have any remaining questions, comments or require any additional information.

Very truly yours,
The Teebagy & Medeiros Law Group, PLLC

Steven C. Teebagy

Crystalin C. Medeiros
For the Firm

cc:
R. Hugh Lumpkin, Esq. (via Email)