UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 22-cv-20979-JB

MICHAEL NEWMAN, as Personal
Representative of the ESTATE OF JOEL
NEWMAN, and EDITH NEWMAN,

      Plaintiffs,

v.

AMERICAN HOME ASSURANCE
COMPANY, INC.,

      Defendant.

_____/

**DEFENDANT AMERICAN HOME ASSURANCE COMPANY'S**
**<u>MOTION FOR SUMMARY JUDGMENT</u>**

Pursuant to Rule 56, Fed. R. Civ. P., Defendant American Home Assurance Company ("American Home") hereby moves the Court to enter summary judgment in its favor dismissing the Amended Complaint in its entirety, or, in the alternative, dismissing Plaintiffs' claims for Additional Living Expense ("ALE"), Rebuilding to Code ("L&O") and punitive damages. For the reasons set forth below, this Motion should be granted.

## INTRODUCTION

This is a first-party insurance bad faith action arising out of a homeowners' property damage claim. Joel and Edith Newman reported a loss to American Home following Hurricane Irma.[1] American Home retained multiple experts to investigate and estimate the loss and paid the amounts determined by those experts. When the parties were unable to reach agreement regarding the amount of the loss, American Home properly invoked the appraisal clause of the insurance policy to resolve the parties' disagreement. The first appraisal panel awarded the Newmans dwelling damage in the amount of $9,179,272.15 and additional living expense ("ALE") in the amount of $1,400,000, which American Home paid in full. The Newmans then demanded a second appraisal for extra expense to obey any law or ordinance to repair the dwelling damage ("L&O"). The second appraisal panel issued an award for "potential" L&O in the amount of $5,827,300.84, which American Home paid to the applicable limits of coverage. Still not satisfied, the Newmans now sue for bad faith, claiming *more* ALE damages, *more* L&O damages, and punitive damages.

For the reasons set forth below, the Court should grant summary judgment in favor of American Home. First, the Newmans' claim is not cognizable because an appraisal award is not a determination of liability. Second, the Newmans' claim for ALE damages fails because the appraisal award -- assuming *arguendo,* it is a determination of liability -- bars the Newmans' claim. The Newmans' claim for ALE damages also fails because the Newmans did not suffer, and American Home did not cause, the damages they seek. Third, the Newmans' claim for L&O damages fails for the same reason -- the L&O damages are "potential" only. Finally, the undisputed facts do not support the Newmans' claim for punitive damages. To the contrary, the record shows that American Home prioritized quality assurance and client service and did not engage in "lowballing" as a "general business practice." In effect, the Newmans seek to punish American

---

[1] American Home issued the insurance policy at issue to the Newmans. American Home is an underwriting company of AIG. The Private Client Group ("PCG") was a business unit of AIG that marketed insurance policies to high net worth individuals, like the Newmans.

Home for exercising its contractual right to resolve the parties' dispute through appraisal. But American Home's proper exercise of a right provided by the insurance policy is not a breach, much less "wanton disregard" for the rights of the Newmans.

**ARGUMENT**

## I.     **The Summary Judgment Standard.**

Summary judgment is appropriate where there is "no genuine issue as to any material fact [such] that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also* Fed. R. Civ. P. 56. A genuine issue of material fact exists when "a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A "mere 'scintilla' of evidence supporting the opposing party's position will not suffice." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir.1990). Where the plaintiff must show "clear and convincing evidence," the court must consider whether a jury applying that evidentiary standard could reasonably find for the plaintiff. *Id.* at 254. "For factual issues to be considered genuine, they must have a real basis in the record." *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1303 (11th Cir. 2009) (citation omitted). Speculation or conjecture cannot create a genuine issue of material fact sufficient to defeat a well-supported motion for summary judgment. *Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005).

The moving party has the initial burden of showing the absence of a genuine issue as to any material fact. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). Once the moving party satisfies its initial burden, the burden shifts to the non-moving party to come forward with evidence showing a genuine issue of material fact that precludes summary judgment. *Bailey v. Allgas, Inc.*, 284 F.3d 1237, 1243 (11th Cir. 2002); *see also* Fed. R. Civ. P. 56(e). If the record, taken as a whole, could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial, and summary judgment is proper. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## II.    **The Court Should Dismiss the Amended Complaint in its Entirety Because the Newmans Failed to Obtain a Prior Determination of Liability.**

As a matter of law, the Newmans have not established the requisite liability for breach of contract against American Home. Instead, they sued for bad faith based solely upon an appraisal award from their Hurricane Irma claim, which was midway between the amounts estimated by the parties' appointed appraisers. Statement of Facts ("SOF") ¶¶ 10, 14. However, no Florida Supreme

2

Court decision holds that an insurer exercising a contractual right to appraisal and then paying the appraisal amount constitutes a finding of *liability* sufficient to bring a statutory bad faith claim. Decisions from Florida's intermediate appellate courts and other courts that hold otherwise are contrary to controlling Florida Supreme Court precedent and wrongly equate arbitration with appraisal, although the two are substantively and procedurally different. In fact, the Florida Legislature clarified this issue by enacting Section 624.1551, Fla. Stat.

Here, there was no arbitration, no litigation, no determination of liability and no breach of an insurance policy. American Home did not deny coverage; it merely exercised its express contractual right to have the value of the Newmans' claimed loss determined in appraisal. Accordingly, the Court should apply Florida Supreme Court precedent, codified by §624.1551, Fla. Stat., and dismiss Plaintiffs' bad faith action.  *Blanchard v. State Farm Mut. Auto. Ins. Co.*, 575 So.2d 1289 (Fla. 1991); *Imhof v. Nationwide Mut. Ins. Co.*, 643 So. 2d 617 (Fla. 1994) *receded from in part on other grounds by State Farm Mut. Auto. Ins. Co. v. Laforet*, 658 So. 55 (Fla. 1995); *Dadeland Depot, Inc. v. St. Paul Fire & Marine Ins. Co.*, 945 So. 2d 1216 (Fla. 2006).

**A.  Decisions from Florida's intermediate appellate courts holding that an appraisal satisfies the condition precedent to a bad faith claim contravene Florida Supreme Court precedent and are not binding on this Court.**

The Florida Supreme Court has held that a bad faith action is not ripe until resolution of the insured's underlying first party action for damages:

> Absent a determination of the existence of liability on the part of the uninsured tortfeasor and the extent of the plaintiff's damages, a cause of action cannot exist for a bad faith failure to settle.

*Blanchard*, 575 So. 2d at 1291.[2]  Soon after its ruling in *Blanchard*, the Florida Supreme Court expanded the condition precedent to sue for bad faith to include resolution of liability in arbitration. *Imhof*, 643 So. 2d at 618–19 (Fla. 1994).  Next, in *Vest v. Travelers Ins. Co.*, 753 So. 2d 1270, 1275 (Fla. 2000), the Florida Supreme Court "continue[d] to hold in accord with *Blanchard* that bringing a cause of action in court for violation of section 624.155(1)(b)1 is premature until there

---

[2] "[T]he reasoning of *Blanchard v. State Farm Mut. Automobile Ins. Co.*, 575 So.2d 1289 (Fla. 1991) is applicable not only to Florida Statutes § 624.155(1)(b) 1, but to Florida Statutes § 626.9541(1)(i), *via* § 624.155(1)(a) 1, as well." *Martin v. Massachusetts Mut. Life Ins. Co.*, 2015 WL 12830376, at *1 (M.D. Fla. Aug. 20, 2015) (quoting *Lane v. Provident Life and Acc. Ins. Co.*, 71 F.Supp.2d 1255, 1257 (S.D. Fla. 1999)).

is a determination of liability and extent of damages owed on the first-party insurance contract." In *Dadeland Depot,* the Florida Supreme Court confirmed that the "resolved favorably" condition precedent was satisfied by "an arbitration award establishing the validity of an insured's claim." *Dadeland Depot*, 945 So. 2d at 1234.

Although the Florida Supreme Court has not expanded this condition precedent to include an appraisal award, other Florida courts have opined that payment of an appraisal award is sufficient to bring a bad faith claim. *See Trafalgar at Greenacres, Ltd. v. Zurich Am. Ins. Co.*, 100 So. 3d 1155, 1157-58 (Fla. 4th DCA 2012) (holding that an appraisal award was "tantamount to a 'favorable resolution' necessary to proceed with a bad faith action."); *Hunt v. State Farm Florida Ins. Co.*, 112 So. 3d 547, 549 (Fla. 2d DCA 2013); *Cammarata v. State Farm Fla. Ins. Co.*, 152 So. 3d 606, 607 (Fla. 4th DCA 2014).   However, this expansion of law from Florida Supreme Court precedent creates tension with existing Florida law.[3]

These non-binding intermediate opinions mistakenly equate arbitration with appraisal and, because they are contrary to Florida Supreme Court precedent, do not control.   *State Farm Mut. Auto. Ins. Co. v. Williams*, 824 F.3d 1311, 1314 (11th Cir. 2014) (holding that decisions from Florida's intermediate appellate courts are not controlling where persuasive authority exists that the Florida Supreme Court would rule differently).

In *Trafalgar,* the initial Florida DCA decision which held that an appraisal award satisfied the condition precedent, the court reasoned there was no difference between an appraisal and arbitration awards.   *Trafalgar at Greenacres, Ltd.*, 100 So. 3d at 1158.   Once *Trafalgar* was decided, Florida courts did not re-evaluate the flawed reasoning of that decision.

However, under Florida law, appraisals and arbitration are entirely distinct processes, procedurally and substantively, that serve different purposes.   "The differences between arbitration and appraisal are well defined in this state."   *Citizens Prop. Ins. Corp. v. Mango Hill #6 Condo. Ass'n, Inc.*, 117 So. 3d 1226, 1229 (Fla. 3d DCA 2013).   An appraisal "is not legal work arising

---

[3] In *Fred Fox v. Starr Indem. & Liab. Co.*, 2017 WL 78828, at *2 (M.D. Fla. Jan. 9, 2017), the court initially rejected the *Cammarata* decision as misapplying Florida Supreme Court precedent. It later reversed course based upon other Florida DCA decisions and because the parties did not put before it persuasive indication that the Florida Supreme Court would rule differently. *Fox v. Starr Indem. & Liab. Co.*, 2017 WL 1541294, at *5 (M.D. Fla. Apr. 28, 2017).   Here, American Home has laid out that persuasive authority in addition to the Florida Legislature's clarification that appraisal does not constitute the determination of liability condition precedent required under Section 624.155, Florida Statutes.  § 624.1551, Fla. Stat.

from an insurance company's denial of coverage or breach of contract; it is simply work done within the terms of the contract to resolve the claim." *Id*.  As such, the appraisal here – conducted within the terms of the Newmans' insurance contract - did not determine coverage or liability, was not governed by any process, procedure, or due process safeguards, and did not even require an explanation for the final appraisal amount.  *See* SOF ¶5.

### B. The 2022 enactment of Section 624.1551, Fla. Stat., confirms that an appraisal does not satisfy the condition precedent.

In May 2022 (Ch. 2022-268, eff. May 26, 2022), the Florida Legislature enacted Section 624.1551, which clarified that, "[n]otwithstanding any provision of s. 624.155, a claimant must establish that the property insurer breached the insurance contract to prevail in a claim for extracontractual damages under s. 624.155(1)(b)." §624.1551, Fla. Stat. Section 624.1551 did not change Florida law; it reaffirmed, or simply codified, Florida Supreme Court precedent that requires a finding of a breach of contract before an insured may seek extra-contractual damages and rejected the wayward intermediate appellate court decisions holding that an appraisal award constituted a liability determination in favor of the insured.  *Id*.

After its enactment in May 2022, §624.1551 was amended in December 2022 (Ch. 2022-271, eff. Dec. 16, 2022) as part of comprehensive insurance reform legislation to reaffirm that Section 624.155 requires a judgment for breach of contract in a court of law to satisfy the condition precedent, and that appraisal does not determine liability.  In 2023, the Florida Legislature explained through subsequent legislation that the December legislation should not be construed to impair any rights under an insurance contract.  *See* Ch. 2023-172, Laws of Fla., § 23.  Here, the December amendment did not impair any rights under the Newmans' insurance contract, as the Newmans seek extracontractual remedies in this case, and further because the December 2022 amendment merely clarified the existing May 2022 enactment of Section 624.1551, which bars the Newmans' claims under §624.155(1) regardless of if and how the subsequent December 2022 amendment is applied.

Moreover, unlike new statutes that are not derived from existing law, where courts must determine retroactivity, the May 2022 enactment of §624.1551, codified existing Florida Supreme Court precedent and clarified the existing §624.155, Fla. Stat. Thus, the Court need not reach any retroactivity analysis to decide this question. The enactment merely reaffirmed the state of the law as it has existed since *Blanchard*. However, if the Court does reach this question, the May 2022

version of §624.1551, Fla. Stat., should also be applied retroactively to bar the Newmans' claims brought under §624.155(1)(b), Fla. Stat.

As the statute in question was enacted after the issuance of the insurance policy, two interrelated inquiries arise when considering whether it applies retroactively. The first inquiry is one of statutory construction: whether there is clear evidence of legislative intent to apply the statute retrospectively. *See Menendez v. Progressive Exp. Ins. Co.*, 35 So. 3d 873, 877 (Fla. 2010). If the legislation clearly expresses an intent that it apply retroactively, then the second inquiry is whether retroactive application is constitutionally permissible. *Id.* (quoting *Metro. Dade Cnty. v. Chase Fed. Hous. Corp.*, 737 So. 2d 494, 499 (Fla. 1999)).

Here, the enacting legislation for §624.1551 stated "[e]xcept as otherwise expressly provided in this act, this act shall take effect upon becoming law." Ch. 2022-268, Laws of Fla., § 233 (eff. May 26, 2022). The broader legislation includes an effective date and various provisions as to the effect of other sections, indicating the Legislature carefully considered effect. The House of Representatives Staff Analysis of the bill states that "the bill has the effect of receding from the [*Cammarata*] decision to the extent [the bill] requires that a breach of contract be established in order to prevail in" a suit for extracontractual damages. House of Representatives Staff Final Bill Analysis, CS/HB 1D Property Insurance, available at https://www.flsenate.gov/Session/Bill/2022D/1D/Analyses/h0001Dz.APC.PDF. The Staff Analysis further explains "the bill may eliminate the ability of a claimant to bring a statutory bad faith lawsuit where the parties have settled through . . . appraisal processes because a breach of contract would not likely have been determined during those processes." *Id*. This history shows the Legislature's intent to clarify existing law and apply it to ongoing claims. If the Legislature intended to limit the provision to policies issued after the effective date, it could have included such language. *See Cole v. Universal Prop. & Cas. Ins. Co.*, 363 So. 3d 1089, 1093 (Fla. 4th DCA 2023) ("If the legislature had intended to limit this presuit notice provision to policies issued after the statute's effective date, the legislature would have included language stating so.").

The second inquiry is whether retroactive application is constitutionally permissible. *Chase Fed.*, 737 So. 2d at 499. In *Cole*, the court found a pre-suit notice requirement providing a condition precedent to suit was retroactive and procedural as it did not change the appellant's rights and obligations. *Cole*, 363 So. 3d at 1093, 1095. Conversely, in *Menendez*, retroactive application of a new statutory pre-suit notice requirement violated constitutional considerations by newly

imposing a penalty, implicating attorneys' fees (a substantive issue), granting an insurer additional time to pay benefits, and delaying an insured's right to bring suit. *Menendez*, 35 So. 3d at 879.

Section 624.1551 is a "a procedural law that 'concerns the means and methods to apply and enforce ... duties and rights' rather than a substantive law that 'prescribes duties and rights.'" *Art Deco 1924 Inc.*, 2022 WL 706708, at *2 (citation omitted). Plaintiffs' rights and obligations are unchanged by § 624.1551, which simply provides the "course, form, manner, means, method, mode, order, process or steps by which a party enforces substantive rights or obtains redress for their invasion." *Kirian*, 579 So. 2d at 732 (citation omitted). The condition precedent imposed by § 624.1551 constitutes "remedies or modes of procedure, which … operate in furtherance of the remedy or confirmation of rights already existing." *Patronis v. United Ins. Co. of Am*., 299 So. 3d 1152, 1156 (Fla. 1st DCA 2020); *Smiley v. State*, 966 So. 2d 330, 334 (Fla. 2007).

Alternatively, if the Court does not enter summary judgment in favor of American Home due to the Newmans' failure to obtain a prior determination of liability, the Court should, pursuant to 28 U.S.C. §1292(b), designate this Order for review to the Eleventh Circuit Court of Appeals. Section 1292(b) designation for interlocutory review is appropriate where an "order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation." *Id*.; *Florida Power & Light Co. v. Westinghouse Elec. Corp*., 785 F.2d 952 (11th Cir. 1986) (granting interlocutory review of District Court order under 28 U.S.C. §1292(b) and certifying question of law to the Florida Supreme Court). Although American Home maintains Florida Supreme Court precedent, as bolstered by recent legislation, is clear, even assuming *arguendo* the Court does not agree, there is, at minimum, a substantial ground for difference of opinion. Therefore, if the Court denies the Motion, American Home respectfully requests the Court to designate the Order under § 1292(b) to enable American Home to pursue an interlocutory appeal to the Eleventh Circuit Court of Appeals.

**III.  The Court Should Enter Partial Summary Judgment in Favor of American Home Dismissing the Newmans' Claim for Additional ALE Damages.**

The Newmans seek three categories of additional ALE damages::

b. The Newmans' incurred alternative living expenses less the amount already paid by American Home [$92,238.01];

c. The amount which should have been paid by American Home as ALE had it located a comparable alternative dwelling [$4,725,000 to $5,600,000];

d. The reasonable rental value of the Property either as an alternative to ALE or in addition to it as may be permitted under applicable law [unstated].

SOF ¶27. For the reasons set forth below, the Court should reject the Newmans' claim.

**A.      The Policy.**

The Policy provides coverage for "Additional Living Expense" ("ALE") as follows:

1.      Additional Living Expense

As described below, under certain conditions, when your residence cannot be lived in because of a covered loss to your house or, if applicable, your contents, we provide coverage for additional living expenses, which consist of extra living expenses, loss of fair rental value, and forced evacuation expenses.
….
a.      Extra Living Expense

If a covered loss makes your residence uninhabitable, we cover any reasonable increase in living expenses incurred by you to maintain your household's usual standard of living. Payment will continue for the shortest reasonable amount of time necessary to restore your residence to a habitable condition or for your household to permanently locate elsewhere.

b.      Fair Rental Value

If you are not able to rent out your residence, or part of your residence, that you usually rent to others, because of a loss that is covered by this policy, we will pay the fair rental value for the reasonable amount of time necessary to restore your residence, or that part of your residence, to a habitable condition.

SOF ¶3.

**B.      The Newmans' rental and purchase.**

The Newmans first reported their claim -- through Stellar -- in October 2017, but did not move out then. According to the Newmans' broker, as of November 2018, the Newmans had been unable to find "an adequate rental." SOF ¶24. According to Mrs. Newman, "there wasn't much at the time to look at that was a little comparable to our home and yet be close." *Id.* She testified that they looked at "a few" that "were really not nice." *Id.* They "liked" the apartment at Mansions of Acqualina because "it was barely used," "it was on the ocean," and "[i]t was close to the house." *Id.* The Newmans entered into a residential lease for the apartment that ran from February 15, 2019 through February 14, 2020. *Id.* The rent was $40,000 per month. *Id.* On or about January 20, 2021, the Newmans entered an Addendum to Lease at the same rate. *Id.* The Addendum also included a "first right of refusal." SOF ¶25. In May 2021, the Newmans purchased the apartment for $10.5 million, exactly $1.4 million less than the $11.9 million listing price. SOF ¶26. Mrs. Newman

explained:" I think the best thing for us to do right now -- because, like I said, he was sick - is to buy the apartment. It could be an investment for us. We could later on sell it. Because I didn't see myself going back to the house." *Id.*

**C.      The appraisal proceedings.**

American Home invoked appraisal in May 2019 after the parties could not agree on the amount of loss. The Newmans appointed George Keys ("Keys") as their appraiser. SOF ¶9. He estimated the Newmans' ALE based on costs "to date" and "projected future costs" to be $2,052,818.01. SOF ¶11. The appraisal panel awarded the Newmans $1,400,000 in ALE benefits. Appraisal Award, dated Sept. 15, 2020 (the "ALE Award"). SOF ¶18. Neither the Newmans nor American Home challenged the ALE Award, which American Home paid in full. SOF ¶19.

**D.      The Newmans' claim for ALE damages is barred by the ALE Award.**

If the Court holds that an appraisal award, like an arbitration award, is a determination of liability and denies summary judgment to American Home on that basis, then the Court should also hold that the Newmans are bound by the damage determinations made in appraisal and are barred from seeking any *additional* ALE damages here. As a matter of law, the Newmans cannot recast their claim for covered ALE damages as a claim for bad faith damages to take a "second bite" at "the same apple," having already sought and obtained the ALE Award, which American Home paid in full.

The Eleventh Circuit addressed a similar issue in *Kaplan v. Nautilus Ins. Co.,* 861 Fed.Appx. 798 (11th Cir. 2021). In *Kaplan,* a bad faith case, the court held that the elements of collateral estoppel were met, barring the plaintiffs' claim for damages previously sought, but not awarded, during the underlying coverage arbitration. The Court specifically rejected plaintiffs' argument that collateral estoppel did not apply because the theory of liability in the underlying coverage arbitration (breach of contract) and the bad faith case were different, describing it as "merely semantic." The Court stated: "It would violate the principles of collateral estoppel to allow [plaintiffs] to relitigate the issue simply because they recharacterized their claim as one of bad faith rather than breach of contract." *Id.* at 803 (citing *Fridman v. Safeco Ins. Co.*, 185 So. 3d 1214, 1225 (Fla. 2016) ("If the amount of the [underlying] verdict is not binding as an element of damages in the bad faith litigation, it would allow the insurer—or the insured, if the verdict were less than anticipated—a second bite at the proverbial apple.")).

The court reached the same conclusion in *Kafie v. Northwestern Mut. Life Ins. Co.*, 2011 WL 4499051 (S.D. Fla. Sept. 27, 2011), a first-party bad faith case. In *Kafie*, the court flatly stated: "[The insured] may not seek any contractual damages under the Policies in this bad faith action. In light of [the insured's] earlier litigation with [the insurer], the doctrine of res judicata also prevents the Court from revisiting or awarding damages available to [the plaintiff] within the scope of the Policies." *Id.* at \*8. Similarly, in *Magaldi v. Safeco Ins. Co. of America*, 2010 WL 2542011 (S.D. Fla. Jun. 22, 2010), another first-party bad faith case, the court held that the underlying coverage case conclusively determined the scope of coverage available under the insurance policy, and limited plaintiff's damages accordingly. *Id.* at \*3 ("Because neither party appealed from that judgment, it is final and conclusive as to any issues actually litigated and determined in that first filed proceeding.").

The same logic applies to the Newmans' claims for ALE damages. The Newmans seek three categories of ALE damages: (i) living expenses that *were* incurred but not awarded in appraisal ($92,238.01), (ii) living expenses the Newmans did *not* incur, but which they claim American Home would have been required to pay if they had ($4,725,000 to $5,600,000), and/or (iii) the reasonable rental value of the Newmans' house. The ALE Award bars *all* three categories because the Newmans had the opportunity to seek -- and *did* seek -- ALE damages in appraisal and obtained the ALE Award (which they did not challenge). Under these circumstances, the Newmans cannot simply recharacterize their contractual claims for ALE benefits as "bad faith" and try again.

If anything, the record suggests the Newmans were *over*-compensated. The Policy clearly states: "Payment will continue for the shortest reasonable amount of time necessary to restore your residence to a habitable condition or *for your household to permanently locate elsewhere*." SOF ¶ 3. (emphasis added). The Newmans' apartment lease started in <u>February 2019</u> and the Newmans purchased the apartment in <u>May 2021</u> (*after* the ALE Award) -- meaning that the Newmans only rented the apartment for a total of <u>26 months</u>. *See* SOF ¶¶25, 26. Moreover, Mrs. Newman testified that, having purchased the apartment, *she "didn't see [her]self going back to the house*." SOF ¶26. In contrast, the appraisal panel awarded the Newmans (and the Newmans received) $1,400,000 -- the equivalent of <u>35 months</u> of rent. SOF ¶18. Thus, the Newmans were awarded <u>$360,000 *more*</u> in ALE benefits in appraisal than the Policy provided.

10

     **E.**     **The Newmans' claim for ALE damages that were never "incurred" is barred by the Policy and Florida law.**

The Newmans also seek as ALE damages benefits that they claim "should have been paid by American Home… as ALE had [American Home] located a comparable alternative dwelling." Am. Compl. ¶121(c). Thus, the Newmans demand "the difference between the actual, $175,000-$200,000 monthly fair rental value of the Newmans' residence, as determined by their expert witness Elena Bluntzer, and the $40,000 monthly rental payments that AIG instead reimbursed the Newmans for the apartment that they rented during the relevant time period." SOF ¶27. These damages total "$4,725,000 to $5,600,000." SOF ¶27. The Newmans' claim for this category of ALE damages fails for two additional reasons.

<u>First</u>, the Policy is clear: "Extra Living Expenses" are only payable if "incurred." The Policy states: "If a covered loss makes your residence uninhabitable, we cover any reasonable increase in living expenses *incurred by you* to maintain your household's usual standard of living." SOF ¶3. Contrary to the Newmans' theory, the Policy did not give the Newmans the right to be paid "living expenses *equivalent to the amount necessary* to maintain your household's standard of living" where such living expenses were never actually incurred. *See Highlands Ins. Co. v. Kravecas,* 719 So.2d 320 (Fla. 3d DCA 1998) ("Because [the insured] had no unreimbursed loss of use, there was no claim under the 'loss of use' coverage. … Stated differently, the purpose of the 'loss of use' coverage is to make whole a displaced homeowner.").

The Newmans, however, did not incur the "fair rental value" amount they now seek to recover. Rather, they rented the Mansions at Acqualina apartment for $40,000 per month and received more than full payment for their *actual* expenses in appraisal. SOF ¶¶18, 25. What they now seek as ALE "damages" is the amount they did *not* spend (which is not covered because it was never incurred). The purpose of insurance is to make the insured whole for damages that the insured suffered; not to provide a windfall. As a matter of Florida law, where there is no claim for coverage, there can be no claim for bad faith. *See, e.g., Hartford Ins. Co. v. Mainstream Constr. Group, Inc.,* 864 So. 2d 1270, 1272 (Fla. 5th DCA 2004) ("If there is no insurance coverage, nor any loss or injury for which the insurer is contractually obligated to indemnify, the insurer cannot have acted in bad faith in refusing to settle the claim. Similarly, if there is no coverage, then the insured would suffer no damages resulting from its insurer's unfair settlement practices.").

<u>Second</u>, Florida law is clear: to recover compensatory damages in a bad faith case, a claimant must show that the insurer's alleged bad faith claims-handling was the cause of her damages. Section 624.155(8), Fla. Stat., states:

> (8) The damages recoverable pursuant to this section shall include those damages which are *a reasonably foreseeable result of a specified violation of this section by the authorized insurer* and may include an award or judgment in an amount that exceeds the policy limits.

(emphasis added). "[T]he existence of a causal connection is a prerequisite – in other words, the claimed damages must be caused by the bad faith." *Perera v. U.S. Fid. & Guar. Co.*, 35 So. 3d 893, 901 (Fla. 2010) (finding no causal connection between insurer's bad faith and damages claimed). "[T]he damages claimed by the insured … must be caused by the insurer's bad faith." *Id.* at 902.

Here, American Home's claims handling did not cause the "fair rental value" amount the Newmans now seek to recover. The Newmans previously sought and received an ALE Award that more than compensated them for the rent they paid prior to purchasing their Mansions at Acqualina apartment. SOF ¶¶18, 25. What they are seeking now is money to "compensate" them for the "Extra Living Expenses" that they purportedly *could have* incurred, but *never did*. However, the *failure* to incur expenses (which because they were never incurred were not reimbursed) is not a "damage," much less a damage "caused" by American Home. Moreover, the undisputed facts show that American Home was <u>*not*</u> the cause of the Newmans' failure to spend more. The Newmans chose the Mansions at Acqualina apartment because it was the best alternative that they could find, not because of anything American Home did or did not do. As Mrs. Newman testified, "there wasn't much at the time to look at that was a little comparable to our home and yet be close." SOF ¶24. Indeed, the Newmans liked the apartment so much, they bought it. SOF ¶26. Accordingly, the Newmans' claim for ALE damages they never incurred necessarily fails.

## F.   The Newmans' claim for "reasonable rental" damages is unsupported by the record.

The Newmans also seek the reasonable rental value of their house, either as an alternative to ALE or in addition to it. *See* SOF ¶27. This ALE claim also fails for an additional reason.

The Policy states: "If you are not able to rent out your residence … *that you usually rent to others*, because of a loss that is covered by this policy, we will pay the fair rental value for the reasonable amount of time necessary to restore your residence." SOF ¶3. However, there is no

evidence that the Newmans "usually rent[ed]" their house "to others." To the contrary, the record is clear that the house served as the Newmans' residence for decades. Accordingly, the Newmans' claim for "reasonable rental" damages also fails.

## IV.   The Court Should Enter Partial Summary Judgment in Favor of American Home Dismissing the Newmans' Claim for Additional L&O Damages.

The Newmans also seek the following additional L&O damages:

> a. The difference between the L&O appraisal award and the American Home Policy's coverage limit for that award [in the amount of $1,209,768].

SOF ¶27. For the reasons set forth below, the Court should reject the Newmans' claim.

### A.   The Policy.

The Policy provides coverage for "Rebuilding to Code" ("L&O") as follows:

9.    Rebuilding to Code

> We will pay the extra expenses to obey any law or ordinance that regulates the repair, rebuilding or demolition of damaged property caused by a covered loss subject to the following:

a.    If the loss is to a house, we will pay up to 30% of the amount of coverage shown on the Declarations Page for that house.

SOF ¶4.

### B.   The appraisal proceedings.

American Home invoked appraisal in May 2019 after the parties could not agree on the amount of loss. SOF ¶8. In his October 28, 2019 letter to the umpire, Keys, the Newmans' appraiser, estimated the dwelling loss (not including ALE or contents) to be $22,753,651.33. SOF ¶10. The same letter concluded with this admonition: "Please take note that this claim is in the appraisal process. Upon completion of an Award, the insured will not have the opportunity to go back to [AIG] should certain components cost be higher than those estimated." SOF ¶12. Keys testified that his estimate included his "best guess" of what "code would be" and that was why the numbers that comprised the estimate were "significant." SOF ¶13. Keys agreed that the number was his "best estimate of what it would cost to repair the house, to bring it back to where it was, consistent with code" and was "turnkey inclusive." *Id.* However, Keys acknowledged that "we're not code officials and only the code official can issue an order as to what you must or must not do." *Id.* The appraisal panel awarded the Newmans $9,179,272.15 for Dwelling (ACV) (the "Dwelling Award"). SOF ¶14. Regarding ALE and contents, the award stated: "YET TO BE

APPRAISED." Regarding L&O ("Ord. & Law"), the award stated: "AS INCURRED PER THE POLICY AND FLORIDA LAW." *Id.*

Following the Dwelling Award, on March 18, 2020, the Newmans' counsel wrote to American Home's counsel, stating: "Because the now-confirmed cost to repair the Newmans' home exceeds 50% of the structure's appraised value of $13,000,000.00, the Newmans will be required to ensure that all aspects of their now 25-year old home are up to the current state and local building codes and ordinances under the "50% rule." SOF ¶16. Similarly, on June 17, 2020, the Newmans' counsel wrote: "Newman has encountered several issues which will trigger law and ordinance coverage." SOF ¶17. On May 27, 2021, the Newmans' counsel demanded "appraisal of the Law and Ordinance portion of [the Newmans'] loss" and again appointed Keys to serve as the Newmans' appraiser. SOF ¶20. Keys estimated the Newmans' "Loss directly pertaining to requirements to Rebuild to Code" to be $6,321,390.29. SOF ¶21. The appraisal panel awarded the Newmans $5,827,300.84 for Ordinance or Law / Code (Replacement Cost) (the "L&O Award"). SOF ¶22. However, the Declaration of Appraisal stated: "**This appraisal was for <u>potential</u> Ordinance or Law related values.**" *Id.* (emphasis in original). In his December 22, 2021 email transmitting the L&O Award, the umpire acknowledged: "As we all agreed, this appraisal is unusual since O&L has not been ordered by the jurisdiction and O&L costs have [not] been incurred." *Id.* Keys similarly conceded that "nothing has been ordered yet." *Id.*

Following the L&O Award, American Home paid the Newmans $4,617,632.40 based on the applicable policy limits but stated: "[T]here are significant issues with the award itself and the lack of proof that the building code expenses were incurred especially since the award uses the term 'Potential' to describe the ordinance or law values." SOF ¶23.

### C.   The Newmans' claim for L&O damages fails because the Newmans cannot show that American Home caused them to suffer any L&O damages.

The Newmans claim as damages the portion of the L&O Award that American Home did not pay because it exceeded policy limits: $1,209,768. SOF ¶27. To prevail, the Newmans must show that their claimed damages are the "reasonably foreseeable result" of American Home's claims handling and were "caused by [American Home's] bad faith." *See supra* at 12-13. The Newmans cannot meet this burden for two reasons.

<u>First</u>, the Newmans never suffered -- nor did American Home cause -- the L&O damages the Newmans now seek to recover. The Policy provides that American Home will pay "extra

expenses to obey any law or ordinance that regulates the repair, rebuilding or demolition of damaged property caused by a covered loss." SOF ¶4. Here, it is undisputed that the Newmans were never required "to obey" any law or ordinance, much less to incur the "extra expenses" to do so. The L&O Award issued by the appraisal panel states: "**This appraisal was for potential Ordinance or Law related values.**" SOF ¶22 (emphasis in original).  Likewise, in his December 22, 2021 email transmitting the award, the umpire acknowledged: "As we all agreed, this appraisal is unusual since *O&L has not been ordered by the jurisdiction* and *O&L costs have [not] been incurred*." *Id*. emphasis added). And, in deposition, Keys conceded that "nothing has been ordered yet." *Id.*

These undisputed facts show that the Newmans did not suffer the L&O damages they now seek to recover as a "reasonably foreseeable result" of American Home's claims handling because they did not suffer those L&O damages *at all*. The Newmans were never required "to obey any law or ordinance" and they never incurred any "extra expenses" to do so -- rather, the L&O Award was "potential" only. Accordingly, the Newmans cannot show that they suffered -- much less that American Home caused -- their purported L&O damages. *See Kingseal, LLC v. Arch Spec. Ins. Co.,* 2023 WL 3121894, *4 (S.D. Fla. Apr. 27, 2023) (holding that "Kingseal [the insured] did not incur its loss until the AHCA (and later DeSoto County) notified Kingseal it was liable for additional repairs and renovations required by the AHCA, the FBC, and the Code").

Second, as a matter of Florida law, the Dwelling Award established the amount of the Newmans' dwelling loss, and American Home paid that award in full. Therefore, the Newmans cannot claim that American Home caused the L&O damages the Newmans now seek to recover.

"[A]ppraisers are charged with determining the amount of the loss when an insurer admits there is a covered loss and there is a disagreement regarding the amount of the loss." *Noa v. Florida Ins. Guaranty Ass'n,* 215 So.3d 141, 143 (Fla. 3d DCA 2017). "[I]n evaluating the amount of loss, an appraiser is necessarily tasked with determining both the *extent* of covered damage and the *amount* to be paid for repairs." *Anoushfar v. Lexington Ins. Co.,* 2021 WL 4848073, *5 (11th Cir. Oct. 18, 2021) (quoting *Cincinnatti Ins. Co. v. Cannon Ranch Partners, Inc.,* 162 So.3d 140, 143 (Fla. 2d DCA 2014)). For this reason, "the question of what repairs are needed to restore a piece of covered property is a question relating to the amount of 'loss' and not coverage." *Id.*

To meet their responsibilities, appraisers are required to be "competent." SOF ¶5. "In order to perform competently, … appraisers must consider the requirements of the applicable building

codes in order to estimate the cost of repair or replacement. This is an area for professional construction industry expertise and should be 'baked into' the appraisers' and umpire's computations, and not left open for a re-appraisal or determination by the court." *Noa,* 215 So.3d at 143.

In *Noa,* the insurer invoked the appraisal clause in an insurance policy after the insured submitted a proof of loss. The parties proceeded to appraisal resulting in an award of $17,602.10. "The appraisal stated that it did not include any allowance for the effects of law and ordinances." *Id.* at 142. After the appraisal award was issued (and paid), the insured's roofing contractor submitted a permit application to repair 30% of the roof. The application was rejected based on the building code, which required that the entire roof be brought into compliance with the current code. The insured asked the insurer to fund the additional amount required to comply, but the insurer denied the claim. The insured then moved the court to order another appraisal "regarding his additional claim for an ordinance and law award." *Id.* at 143. The court denied the motion and the appellate court affirmed, stating:

> To hold otherwise would allow the insured's post-appraisal roofing contractor to step into the adjustment process as a super-umpire whose opinion supersedes the appraisal and requires a new round of valuation estimates. … If the insured intends to offer a roofer's professional opinion that the applicable building code will require replacement of the entire roof, the appraisal process must surely be the time to offer that evidence -- not as an afterthought on the heels of the appraisal.

*Id.* at 144. The court specifically noted that "[the insured] and his appraiser had already submitted the costs of the full-roof repair they proposed to the first appraisal panel." *Id.*

*Anoushfar* is like *Noa.* In *Anoushfar,* the insured invoked the appraisal clause after the insurer determined that the claimed loss did not exceed the hurricane deductible. The parties proceeded to appraisal and the appraisal panel awarded the insured $504,173.54 for property damage. After the appraisal award was issued (and paid), Anoushfar retained an engineer, claimed that the property was a "total loss," and demanded that the insurer either pay the "total loss" claim or submit the claim to appraisal. The insurer refused to do either and Anoushfar sued.

The district court rejected Anoushfar's claim, relying on *Noa,* and the Eleventh Circuit affirmed. The Eleventh Circuit stated:

> While this case does not involve an 'Ordinance &Law' coverage provision, we agree with the district court that *Noa*'s reasoning is applicable here. Whether the damage to Anoushfar's Property constituted a total loss was within the appraisal panel's

> expertise and should have been baked into their computations. Additionally, prior to the appraisal, Anoushfar retained a professional insurance consultant and engineering firm to estimate the RCV of the damage to the Property and received an estimate of $576,905.26.... In other words, Anoushfar's claim that he did not realize until after the appraisal award that the damage to the Property could constitute a 'total loss' is not plausible. Thus, Anoushfar should have raised the total loss issue to the appraisal panel in the first instance.

*Anoushfar,* 2021WL 4848073, *6.

In the words of *Noa* and *Anoushfar,* L&O was "baked into" the Newmans' $9,179,272.15 Dwelling Award. Keys testified that the $22,753,651.33 estimate that he submitted in the first appraisal included his "best guess" of what "code would be." SOF ¶13. He also agreed that the $22,753,651.33 estimate that he submitted in the first appraisal was his "best estimate of what it would cost to repair the house, to bring it back to where it was, consistent with code" and was "turnkey inclusive." *Id.* Thus, based on *Noa* and *Anoushfar,* the Newmans were not entitled to *any* L&O over and above the Dwelling Award, which American Home paid in full. And, because the Newmans were not entitled to *any* L&O, they cannot show that American Home caused the *excess* L&O damages they now seek to recover. *See, e.g., Mainstream Constr.,* 864 So. 2d at 1272.

## V.   The Court Should Enter Partial Summary Judgment in Favor of American Home Dismissing the Newmans' Claim for Punitive Damages.

As set forth above, there is no basis for a bad faith claim under these circumstances, let alone a claim for punitive damages. American Home hired experts to investigate the Newmans' loss; paid what those experts estimated; promptly invoked appraisal as provided by the Policy when the parties could not agree to the amount of the loss; and then paid the amounts awarded.

Notwithstanding, the Newmans allege that American Home had a "general business practice" of failing "to properly conduct thorough investigations," "shifting of costs for those investigations to its insureds," "providing lowball estimates," and "failing to timely and fully evaluate, quantify, and pay the actual amounts of its insureds' covered losses." Am. Comp. (ECF 42) ¶124. They further allege that AIG "encourage[d] adjusters to underpay claims and delay payments" through "incentives designed to encourage adjusters and claims supervisors to reach certain arbitrary targets and goals (metrics) to reduce the internal and external cost of investigating claims as well as the amount paid to policyholders" And that these "targets, goals, and metrics," "were enforced through annual performance reviews and employment and compensation decisions." *Id.* ¶ 132.

Although the picture the Newmans attempt to paint is grim indeed, there is simply no evidence to support it. As set forth below, the Newmans' own claims handling expert could not identify any improper "targets, goals or metrics" or any evidence indicating that any "targets, goals or metrics" caused their claim -- or any other claim -- to be under-paid or under-investigated. At most -- or at worst -- the Newmans can show that AIG ultimately paid more to resolve a handful of claims than AIG initially offered to pay. It is not enough.

## A.   Florida's statutory punitive damages standard.

Section 624.155(5), Fla. Stat., sets forth the required elements of the Newmans' claim for punitive damages:

> Punitive damages may not be awarded under this section unless the acts giving rise to the violation occur with such frequency as to indicate a general business practice and these acts are:
>
> (a)  Willful, wanton, and malicious; [or]
>
> (b)  In reckless disregard for the rights of any insured.

Section 768.72(2), Fla. Stat., further provides that "[a] defendant may be held liable for punitive damages only if the trier of fact, by clear and convincing evidence, that the defendant was personally guilty or intentional conduct or gross negligence."

To prevail on their statutory punitive damages claim, the Newmans must first prove that "the acts giving rise to the violation occur with such *frequency* as to *indicate* a *general* business *practice*." (emphasis added). The court's analysis "begin[s] with the language of the statute." *See, e.g., Metropolitan Cas. Ins. Co. v. Tepper,* 2 So. 3d 209, 214 (Fla. 2003). "When considering the meaning of terms used in a statute, the Court looks first to the terms' ordinary definitions, which "may be derived from dictionaries." *Id.* "It is an elementary principle of statutory construction that significance and effect must be given to every word, phrase, sentence, and part of the statute if possible, and words in a statute should not be construed as mere surplusage." *Hechtman v. Nations Title Ins. of New York,* 840 So. 2d 993, 996 (Fla. 2003). Further, "statutes imposing a penalty must always be construed strictly in favor of the one against whom the penalty is imposed and are never to be extended by construction." *Hotel & Restaurant Comm'n v. Sunny Seas No. One, Inc.,* 104 So.2d 570, 571 (Fla. 1958); *accord Liner v. Workers Temporary Staffing, Inc.*, 990 So. 2d 473, 447 (Fla. 2008) ("In Florida, the general rule is that any ambiguity present in a civil statute of a penal nature is construed in favor of the party alleged to have violated the statute").

"Frequency" means "[t]he fact of occurring often or being repeated at short intervals."[4] "Indicate" means "[t]o point out, point to, make known, show (more or less distinctly).[5] "General practice" means "[a] way of doing things that is widespread or current among the majority of a community."[6] Putting these definitions together, to meet their statutory burden, the Newmans must show that the acts of which they complain in this case occur so often that they show American Home's way of doing things.

The Florida cases addressing the meaning of the "general business practice" element of §624.155(8), Fla. Stat., are of limited assistance. The only reported Florida state court decision interpreting the element in the summary judgment context is *Howell-Demarest v. State Farm Mutual Automobile Insurance Co.*, 673 So. 2d 526 (Fla. 4th DCA 1996). There, the insured cited "three other reported decisions" as evidence of a "general business practice." *Id.* at 528. The appellate court reversed the summary judgment entered in favor the insurer, but stated the claimant would have to demonstrate that the insurer had engaged in the alleged violation "far more frequently than that" to prevail. *Id.* at 529. What *would* constitute "frequency" meeting the statutory standard was left unstated by the court.

Following *Howell-Demarest*, multiple Florida federal courts addressed the meaning of the "general business practice" element in terms of "frequency." In *Hogan v. Provident Life & Acc. Ins. Co.,* 665 F. Supp. 2d 1273, 1289 (M.D. Fla. 2009), the court held that the insured had adequately pled a "general business practice" where a market conduct examination showed that more than 40% of the total population of claims were affected by the alleged bad faith conduct. The court wrote: "The high reversal rate of reassessed claims initially denied over an eight-year period plausibly establishes a general business practice by [the insurer] to deny claims in reckless disregard for insured's rights." *Id.* at 1289. *See also Chicken Kitchen USA, LLC v. Maiden Spec. Ins. Co.,* No. 14-23282, 2016 WL 3982493 (S.D. Fla. July 22, 2016) ("If the observation that an insurer denied or reduced three claims was enough for an insured to assert punitive damages, then virtually *every* single case could proceed with a punitive damages claim."); *Fox Haven of Foxfire Condo, IV Ass'n, Inc. v. Nationwide Mut. Fire Ins. Co.*, No. 2:13-399, 2015 WL 667935, at *6

---

[4]  Oxford English Dictionary, https://www.oed.com/search/dictionary/?scope=Entries&q=frequency.

[5]  *Id.,* https://www.oed.com/search/dictionary/?scope=Entries&q=indicate.

[6]  *Id.,* https://www.oed.com/search/dictionary/?scope=Entries&q=general+practice.

(M.D. Fla. Feb. 17, 2015) ("Typically, a plaintiff establishes a general business practice by demonstrating that the insurer also acted in bad faith when evaluating numerous other claims.").

In contrast, in *Jablonski v. St. Paul Fire & Marine Ins. Co.*, No. 07-CV-00386, 2010 WL 1417063, at *6 (M.D. Fla. Apr. 7, 2010), the court "read *Howell–Demarest* as standing only for the more limited proposition that, in order to show a general business practice, a plaintiff must show 'other acts' outside his own claim" and that "if, a plaintiff chooses to use 'other claims' evidence to satisfy this 'other acts' requirement, it is then, and only then, that the plaintiff must produce evidence of far more than three other claims in addition to his own to show a general business practice." More recently, in *Lord v. FedNat Ins. Co.,* 363 So.3d 1160 (Fla. 5th DCA 2023), a Florida state court interpreted the "general business practice" element in the context of a motion for leave to amend to allege punitive damages. The court acknowledged *Jablonski,* but held that leave to amend was properly denied. The court held that "deposition testimony suggesting that [the insurer] had no specific standards relating to settling claims after receiving a CRN or for adjusting a lightning strike claim" was not sufficient in the absence of "evidence of other instances to establish a general business practice of committing the alleged violations." *Id.* at 1163.

Florida federal courts have also rejected attempts "to show a general business practice by inference" – "that is, through general testimony . . . that [the plaintiff's] claim was handled in accordance [the insurer's] business practices," finding it "likely to be insufficient." *Jablonski v. St. Paul Fire & Marine Ins. Co.*, No. 07-CV-00386, 2010 WL 1417063, at *6 (M.D. Fla. Apr. 7, 2010); *see also 316, Inc. v. Maryland Cas. Co.,* 625 F.Supp.2d 1179 (N.D. Fla. 2008) (declining to "extrapolate from [the insurer's] alleged conduct toward a single insured – Plaintiff – a 'general business practice' [where plaintiff provided] no factual foundation to support such a leap").

General assertions regarding an insurer's alleged profit motive have also been held insufficient. *See Moss v. Liberty Mut. Fire Ins. Co.,* No. 16-cv-677, 2017 WL 4676629, at **5-6 (M.D. Fla. Aug. 18, 2017) (dismissing punitive damages claim). In *Moss*, the court rejected as "conclusory" plaintiff's allegations that the insurer's "hiring of a business consultant to develop programs to increase [the insurer's] profits and to motivate employees to pay claims unfairly and make 'low ball' offers to claimants and that [the insurer's] profits have increased." *Id.* at *6. The court stressed: "Plaintiffs fail to provide any factual underpinnings which make the leap from the alleged bad faith delay in processing Plaintiffs' insurance claim to a general business practice of acting with bad faith toward other unnamed insureds." *Id.*

20

**B.      The Newmans' punitive damage claim should be dismissed because no jury applying the clear and convincing evidence standard could reasonably find for the Newmans based on the evidence.**

The evidence is insufficient to allow a fact-finder to reasonably conclude by clear and convincing evidence that American Home engaged in "the acts giving rise to the violation [of which the Newmans complain] with such frequency as to indicate a general business practice" of American Home. Contrary to the Newmans' boilerplate allegations, the evidence shows that the "targets, goals and metrics" employed by AIG were not improper, nor were they improperly used to incentivize claims-handlers to "lowball" or under-investigate claims. Evidence of "frequency" is also lacking.

**1.      The targets, goals and metrics of the claims organization were not improper and were not improperly used.**

There is no evidence supporting Plaintiffs' contention that the targets, goals and metrics employed by AIG were improper, or that they were improperly used to incentivize claims personnel to under-investigate or under-pay claims. Although the Newmans' claims handling expert, Bernd Heinze, offered conclusory opinions regarding the putative impropriety of the financial goals and metrics in the performance evaluations of claims personnel, when confronted with performance evaluations, he could not identify *anything* improper in them. SOF ¶42. Heinze conceded that he had seen no documents in which a claims professional had ever been directed not to pay a claim to meet a financial goal. SOF ¶29. Heinze conceded that he had seen no documents in which any third-party administrator, engineer, building consultant, or vendor had been directed to reduce an estimate so that a claims professional could meet a financial goal. *Id.* And Heinze conceded that the Claims-Handling Best Practices "comport[ed] with industry custom and practice." SOF ¶31.

The Newmans contend that the relative weighting of certain goals in the performance evaluations suggests that AIG prioritized profits over proper claims handling, but there is no evidence to support the Newmans' contention. The performance evaluations show that year after year, the emphasis was on quality assurance and client service and satisfaction. SOF ¶¶38-41. ██

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████      SOF ¶40. Moreover, the performance evaluations show that AIG's claims

professionals, including the personnel who worked on the Newmans' claim, routinely received high marks for compliance. SOF ¶¶38-41.

The Newmans make much of the fact that the word "profitability" appears in the goals in certain performance evaluations, but they ignore the substance of the evaluations which explain how claims professionals *properly* contribute to the insurance company's profitability. The "self comments" of manager Patrick Flaherty, who worked on the Newmans' claim, are emblematic:

**SELF COMMENTS:**



SOF ¶44. These comments show a concern with properly and efficiently running a claims organization, not an intent to save money by under-investigating or under-paying claims to the detriment of policyholders. That evidence, which is fundamental to the Newmans' punitive damages claim, is fundamentally lacking.

Similarly lacking is any connection between the targets, goals and metrics in the performance evaluations and the bad faith claims-handling of which the Newmans complain. The Newmans allege that the financial goals improperly incentivized claims professionals to under-investigate and under-pay claims, but there is no evidence to support the allegation. Am Comp.¶¶ 130-32. The law is clear: the mere existence of "policies, practices, and procedures" is not bad faith. Rather, the Newmans must show that they were "directly harmed by them, (i.e., that the bad faith in handling [their] claim resulted, at least in part, from [those] policies, practices, and procedures)." *Kearney v. Auto-Owners Ins. Co.,* No. 8:06-cv-595, 2009 WL 3712343, at *7 (M.D. Fla. Nov. 5, 2009). Here, there is *no* evidence that the so-called "lowballing" of which the Newmans complain was the result of any target, goal or metric, much less the clear and convincing evidence required to prevail on a punitive damages claim.

Regardless, the performance evaluations show that reducing average claim severity and reducing loss adjustment expenses were *not* identified as goals. SOF ¶¶45, 50. ▮▮▮▮▮▮▮



SOF ¶43

The testimony of Andrew Pacholec, American Home's corporate representative, was clear:

SOF ¶45.

### 2. The Newmans cannot show "frequency."

Evidence that the acts of which the Newmans complain occurred with such frequency as to indicate a general business practice is also lacking. In the Amended Complaint, the Newmans identified "[a] sample of CRNs" allegedly indicating that "American Home had a general business practice." Am. Comp. ¶165. However, "the mere fact that other insureds have filed CRNs similar to [the Newmans'] is not evidence that [AIG] assessed those other claims in bad faith. It is merely evidence that other insureds were not satisfied with [AIG's] initial assessment of the claim." *Fox Haven*, 2015 WL 667935, at *7 (granting summary judgment to insurer on demand for punitive damages).

The claim notes related to the CRN files, which were produced in discovery, do nothing to alter this analysis, for two reasons. <u>First</u>, the claim notes show only that AIG ultimately paid more to resolve the claims at issue than initially offered. But every claim "presents a unique set of facts" and is "adjusted on their own merits." SOF ¶53. <u>Second</u>, there is no evidence that the 22 CRNs are representative or "indicative" of American Home's "general business practice." The 22 CRNs were selected by the Newmans' counsel. Am. Comp., Composite Exhibit D. They are not a "sample" in any sense. During the 2014-2021 period at issue in this case, PCG claim professionals handled over 23,000 property claims in Florida. SOF ¶54. The 22 CRNs selected by the Newmans' counsel comprise less than **0.1%** of that number. And, as Heinze necessarily conceded, one in a thousand "would not be frequent." *Id.* Indeed, Heinze agreed that if only one (1) out of twenty-one (21) files (4.76%) exhibited the bad faith claims handling conduct of which the Newmans complain, he "[p]robably [could] not" conclude that the conduct constituted a "general business practice." *Id.* The law is in accord. *Hogan v. Provident Life & Acc. Ins. Co.,* 665 F. Supp. 2d 1273, 1289 (M.D. Fla. 2009) (holding that the insured had adequately pled a "general business practice " claim where a market conduct examination showed that more than **40%** of the total population of claims were

affected by the alleged bad faith conduct); *Hartford Roman Catholic Diocesan Corp. v. Interstate Fire & Cas. Co.,* 905 F.3d 84, 96 (2d Cir. 2018) (holding that 9-11% of a "representative sample" of claims did not demonstrate that the insurer had engaged in unfair or deceptive practices "with such frequency as to indicate a general business practice.").

The randomly selected claim notes related to the three vendors identified by the Newmans -- Advanced Adjustment, Haag, and Daniels Brothers -- also do not show "frequency." ███████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ███████████████████████████ SOF ¶54. None of these numbers are representative or "indicative" of a "general business practice" to retain vendors that "lowball" policyholders, as the Newmans have alleged.  The simple fact is that the Newmans' allegations are not borne out by the evidence.

### 3. There is no proof that American Home's acts were "willful, wanton, and malicious" or in "reckless disregard."

Finally, to state a claim for punitive damages, the Newmans must also show that American Home's bad faith claims handling conduct was "willful, wanton, and malicious" or "in reckless disregard for the rights of any insured." § 624.155(5), Fla. Stat. "In the context punitive damages, [the] terms ["reckless conduct" and "willful or wanton conduct"] have been used interchangeably." *Williams v. City of Minneola,* 619 So. 2d 983, 986 (Fla. 5th DCA 1993) (citations omitted). Thus, "[a]n award of damages under the statute also requires proof of a degree of outrageous or egregious conduct by the insurer." *Dunn v. National Sec. Fire and Cas. Co.,* 631 So.2d 1103, 1109 (Fla. 5th DCA 1993). "To merit an award of punitive damages, the defendant's conduct must transcend the level of ordinary negligence and enter the realm of willful and wanton misconduct." *Estate of Despain v. Avante Group, Inc.,* 900 So. 2d 637, 640 (Fla. 5th DCA 2006). "The conduct punitive damages properly condemns and hopefully deters is willful and wanton misconduct of a character no less culpable than what is necessary to convict of criminal manslaughter." *Tiger Point Golf & Country Club v. Hipple,* 977 So. 2d 608, 610 (Fla. 1st DCA 2007). "Gross negligence does not meet the standard for an award of punitive damages." *Williams,* 619 So. 2d at 987 n.2 (citations omitted).

The Newmans allege that "[d]espite knowing that its adjusters were over capacity, with reckless disregard for the rights of the Newmans and other insured's, the AIG Private Client Group

continued to put people like Ms. Spinella in a position to mis-handle claims." Am. Comp. ¶ 144. The evidence does not support the Newmans' claim. Although Spinella complained about having to take on additional responsibilities in her performance evaluations, her manager, William Murphy, *complimented* her performance:

**Manager Comments :**

████████████████████████████████████████████████████████

SOF ¶¶56, 57. Moreover, there is no evidence that Spinella's responsibilities negatively affected the handling of any claim, much less that AIG "recklessly" imposed an unmanageable workload on Spinella or anyone else to the detriment of policyholders. To the contrary, Best Practice audit scores and customer satisfaction remained consistently high. SOF ¶¶58-60. Nor is there any evidence in the record to suggest that AIG or American Home engaged in any conduct that would warrant the imposition of punitive damages.

## <u>CONCLUSION</u>

For the foregoing reasons, the Court should enter an Order granting summary judgment in favor of American Home dismissing the Amended Complaint in its entirety, or, in the alternative, dismissing the Newmans' claims for ALE damages, L&O damages, and punitive damages.

Respectfully submitted,

**CLYDE & CO US LLP**
1221 Brickell Avenue, Suite 1600
Miami, Florida 33131
Tel: (305) 446-2646

By: */s/ Laura Besvinick*
    Laura Besvinick
    Florida Bar No. 391158
    Julie Nevins
    Florida Bar No. 182206
    Email: laura.besvinick@clydeco.us
    Email: julie.nevins@clydeco.us
    Sec: paul.kalandiak@clydeco.us

**DENTONS US LLP**
Angel A. Cortiñas
Florida Bar No. 797529
Jonathan Kaskel
Florida Bar No. 52718
1 Alhambra Plaza, Penthouse
Coral Gables, Florida 33134
Telephone: 305-537-0009
angel.cortinas@dentons.com
nancy.salazar@dentons.com

**GRAY ROBINSON, P.A.**
Jack R. Reiter
Florida Bar No. 28304
333 SE 2nd Ave, Suite 3200
Miami, FL 33131
Telephone: 305-416-6880
jack.reiter@gray-robinson.com

*Counsel for Defendant American Home*
*Assurance Company*

## <u>CERTIFICATE OF SERVICE</u>

**I HEREBY CERTIFY** that on October 27, 2023, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notice of electronic filing to all counsel of record.

By: <u>/s/ Laura Besvinick</u>